**The UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Terry YAZZIE, Defendant-Appellant.**

**No. 80–1429.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted July 14, 1981.

Decided Sept. 18, 1981.

Certiorari Denied Jan. 25, 1982.
See 102 S.Ct. 1282.

R. Raymond Twohig, Jr., Asst. Federal Public Defender for the District of New Mexico, Albuquerque, N. M., for defendant-appellant.

Stanley Kotovsky, Jr., Asst. U. S. Atty. for the District of New Mexico, Albuquerque, N. M. (R. E. Thompson, U. S. Atty. for the District of New Mexico, Albuquerque, N. M. with him on the brief), for plaintiff-appellee.

Before BARRETT and SEYMOUR, Circuit Judges, and BROWN,* Senior District Judge.

WESLEY E. BROWN, Senior District Judge.

This is a criminal appeal arising out of appellant Yazzie's conviction by a jury of voluntary manslaughter in the stabbing death of David James, in violation of 18 U.S.C.A. § 1153 and 1112(a). Both Yazzie and James were Indians, and the crime occurred within the Navajo Indian Reservation. Though appellant was indicted by the grand jury on the charge of second-degree murder, the jury acquitted him of that charge, and found him guilty only of the lesser included offense of voluntary manslaughter. On appeal, five issues were presented: The first two concern the composition of the grand jury which indicted Yazzie, and the petit jury which convicted him, while the last three concern alleged errors in the instructions given by the district court. We address each of the issues in turn.

I. The Composition of the Grand and Petit Juries

Prior to trial, defense counsel moved to dismiss the indictment on the basis that the underrepresentation of Indians on the grand and petit jury venires denied Yazzie his rights to equal protection of the laws under the Fifth Amendment,[1] and to juries drawn from a fair cross section of the community under the Sixth Amendment. After evidentiary hearings on February 8 and 25, 1980, the district court found that Yazzie had not made out a prima facie case of constitutional violations in the jury selection process, and denied the motion to dismiss. The evidence presented at these hearings consisted primarily of testimony by the clerk of the United States District Court regarding operation of the jury selec-

---

* Honorable Wesley E. Brown of the United States District Court for the District of Kansas, sitting by designation.

1. "Although 'the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process.' Thus, if a classification would be invalid under the equal protection clause of the Fourteenth Amendment, it is also inconsistent with the due process requirements of the Fifth Amendment." *Johnson v. Robinson,* 415 U.S. 361 at 364, 94 S.Ct. 1160 at 1164, 39 L.Ed.2d 389 at 396 (1974), in Note 4. (Citations omitted.)

tion plan used in the district, testimony by an expert in the field of statistics, and testimony from various county clerks, and the director of elections for New Mexico regarding voter registration in the state.

The clerk of the district court testified that the jury selection plan used in the District of New Mexico had been adopted by the district court and approved by the Judicial Conference of the Tenth Circuit, as required by 28 U.S.C.A. § 1863. Under the plan and pursuant to the Jury Selection and Service Act of 1968, 28 U.S.C.A. § 1861, et seq., as amended, a master jury wheel is reconstituted once every four years by obtaining from the county clerks a list of all the registered voters in the state, determining the number of prospective jurors needed, and dividing the number of registered voters available by the number needed, to arrive at an "increment". A starting number is then drawn at random by one of the judges of the district in open court, and the person whose name corresponds to that number on the registered voter list, and persons whose names fall at successive increments, are sent a qualification questionnaire. When the questionnaires are completed and returned, the names of those persons who are not disqualified or excused are placed in the qualified jury wheel to be summoned as needed. The names of those to be actually summoned to serve on a grand or petit jury are randomly selected from the qualified jury wheel by using the same procedure described above for establishing the master wheel. The clerk of the district court also testified that under his direction, a survey of all of the returned questionnaires had been performed, categorizing them by race, and comparing the percentages of persons found qualified as prospective jurors with the percentages of persons of that race in the general population, according to the 1970 Census. These statistics were the basis for the expert testimony and the decision of the district court.[2] The county clerks and the director of elections for the state testified that no discrimination was practiced in registration of voters, that no one was denied the right to

2. The chart of summarized statistics introduced in evidence at the hearings below is reproduced

register, including Indians, and that in fact the registration of Indian voters was being encouraged by the state through a minority registration program, and, in some counties, by the appointment of deputy registrars in Indian pueblos and reservations.

 The United States Supreme Court, in two recent cases, has clarified the elements of prima facie showings for both equal protection and fair-cross-section challenges to jury selection. *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), dealing with an equal protection challenge in the context of grand jury selection, stated at 430 U.S. 494–495, 97 S.Ct. 1280, 51 L.Ed.2d 510–511:

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class. Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case. (Citations omitted).

In order to establish a prima facie violation of the fair-cross-section requirement, as set forth in *Duren v. Missouri*, 439 U.S. 357 at 364, 99 S.Ct. 664 at 668, 58 L.Ed.2d 579 at 586–587 (1979):

> . . . the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not

in the appendix to this opinion.

fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

While equal protection and fair-cross-section cases are not entirely analogous, as noted in footnote 26 in the *Duren* decision, 439 U.S. at 368, 99 S.Ct. at 670, 58 L.Ed.2d at 589, both violations require a showing of a distinctive group and a substantial underrepresentation of that group in jury venires before a prima facie case is established and the burden of proof shifts.

In *United States v. Test*, 550 F.2d 577 (10th Cir. 1976), this Court considered statutory and constitutional challenges to the jury selection plan for the District of Colorado, which, having been adopted under the federal Jury Selection and Service Act, supra, was very similar to the one here in question. Although the *Test* case was decided prior to *Castaneda* and *Duren*, we find that those recent Supreme Court decisions have reinforced the reasoning in *Test*, and that it controls the case before us.

The state jury selection procedures under scrutiny in *Castaneda* and *Duren* did not have the definitive requirement of the federal Jury Selection and Service Act, supra. We need not repeat here the constitutional and statutory standards set forth in *Test* because those standards apply as well to the District of New Mexico as to the District of Colorado.

We do repeat what was said in *Test* concerning the practical operation of a jury system.

Defendants also overlook the fact that in the day-to-day operation of the jury system, the criminal defendant is not indicted or convicted by the community at large, but rather by relatively small groups of 12 or 23 persons selected to represent the community on petit and grand juries. In assessing whether a given defendant's constitutional or statutory rights have been violated through the operation of a jury selection process, the proper focus of inquiry must therefore be the impact of the challenged process on the grand and petit juries. This assessment must be made in light of the well-settled rule that a defendant has no right to a grand or petit jury of any given demographic composition, but only to jury panels selected from a source "reasonably representative" of the community. E. g., *Taylor v. Louisiana, supra,* 419 U.S. [552] at 538, 95 S.Ct. 692 [at 701, 42 L.Ed.2d 690]. *Alexander v. Louisiana, supra,* 405 U.S. [625] at 628, 92 S.Ct. 1221 [at 1224, 31 L.Ed.2d 536]. It must likewise be remembered that our jury system of necessity deals with living individuals rather than fractional percentage persons. Changes in the demographic composition of juries and jury panels can therefore only be made by the addition or deletion of one or more individuals. Both Congress and the courts have been mindful of this latter fact in concluding that only "gross" or "marked" disparities or "substantial" departures from a "fair cross section" of the community require judicial intervention.

The *Test* court examined several modes of comparison to determine proportional representation, including absolute disparity, comparative disparity, and the absolute impact standard[3], and held that an absolute disparity of approximately 4% was insufficient to establish a prima facie case of systematic exclusion.

■ There is no question that Indians constitute a distinctive group in the community, so our analysis begins with the second prong of each violation alleged, that is,

---

3. The absolute disparity or percentage difference is determined by subtracting the percentage of Indians on the jury venires from the percentage of Indians in the general population. The comparative disparity or percentage difference is found by dividing the absolute disparity by the percentage of Indians in the general population or community. The absolute impact standard is designed to evaluate the effect of underrepresentation in terms of the reduction in number of Indians on a given panel from the number which would be expected absent the underrepresentation. It is obtained by multiplying the absolute disparity by the total number of persons on a given panel. *United States v. Test*, 550 F.2d at 588–589, fn. 11 and 12.

whether the statistics show a substantial underrepresentation of Indians in the grand and petit jury venires. The primary figures in the present case are those indicating the absolute disparities for the Albuquerque-Santa Fe Division, from which Yazzie's petit jury was drawn, and for the entire state, from which the grand jury which indicted Yazzie was selected.[4] It is the absolute disparity that is the starting place for all other modes of comparison. The key figures selected by the district court for the absolute disparity comparison were the percentage of Indians in the general population over the age of 18, as shown by the 1970 Census, and the percentage of questionnaires returned by Indians. The district court rejected the expert's use of the percentage of Indians of all ages in the community, and we think properly so, since by statute only those 18 and older are qualified to serve on grand or petit juries. 28 U.S.C.A. § 1865(b)(1). The district court

should not have used the percentage-of-questionnaires-returned figure, however, as it is only those persons returning questionnaires *and found qualified* who make up the final jury panels. Because the assertion of the appellant is that unconstitutional violations may have occurred at any stage of the selection procedure, the appropriate figure for comparison to the percentage of Indians in the community is the percentage of Indians actually qualified for jury service at the final venire stage. *Duren*, 439 U.S. at 366–367, 99 S.Ct. at 669–670, 58 L.Ed.2d at 588. The discrepancies caused by use of the wrong figure here, however, being .24% in the Albuquerque-Santa Fe petit jury instance, and .13% in the state grand jury instance, are so slight that they do not diminish the validity of the district court's conclusions. The following table sets out the five modes of comparison for the *Test* case, and for the grand jury and petit jury in this case.

| Mode of Comparison | Test | Yazzie Grand Jury | Yazzie Petit Jury |
|---|---|---|---|
| Absolute Disparity (%) | 4.08% | 2.94% | 4.29% |
| Comparative Disparity (%) | 46% | 45.2% | 46.3% |
| Impact on Panel of 50 Jurors (in persons) | 2.0 | 1.5 | 2.1 |
| Impact on Grand Jury of 23 Jurors (in persons) | .9 | .7 | 1.0 |
| Impact on Petit Jury of 12 Jurors (in persons) | .49 | .35 | .51 |

■ It will be noted that the figures in the case at bar and those in *Test* are strikingly similar in all the modes of comparison. They do not begin to approach the 40%

absolute disparity found to establish a prima facie case in *Castaneda*, nor the 39.5% absolute disparity in *Duren*, nor even the smallest disparity of 14.7% cited in *Castane-*

4. In calculating the absolute disparities, the district court was hampered by the 1970 Census figures which did not separate the "Indian" and "Other" categories for persons over 18. To achieve a uniform comparison, the district court also added the "Other" category to the "Indian" category in arriving at the percentage

of Indians on the jury venires. Considering the uniformly small percentage of persons in the "Other" category in all columns of the chart, we do not believe this device seriously affects the disparity conclusions, and thus we also employ it.

da as having been found sufficient in *Jones v. Georgia*, 389 U.S. 24, 19 L.Ed.2d 25, 88 S.Ct. 4 (1967). As in *Test*, we are not able to find that the disparities shown here are sufficiently "gross" or "marked" so as to reveal a substantial underrepresentation of Indians on jury venires under equal protection analysis, nor that the representation of Indians on the panels is not fair and reasonable under the fair-cross-section requirement. Thus, we hold that the district court was correct in ruling that no prima facie case of either violation had been shown by these statistics, and in denying the motion to dismiss the indictment on that basis.

## II. The Motion for Limited Remand

Appellant has filed with this Court a motion for limited remand so that the district court can: (1) Ascertain the effect of the 1980 Census on its denial of the motion to dismiss the indictment; (2) reconsider its ruling on the motion to dismiss in light of additional evidence to be introduced concerning the use of tribal rolls as supplemental sources of prospective jurors; and (3) "explore" his claim of prosecutorial misconduct in failing to advise defense counsel of a voter dilution suit against San Juan County in which the government's position was in conflict with testimony it presented in this case. All three divisions of the motion are, of course, related to appellant's motion to dismiss the indictment for alleged underrepresentation of Indians on the juries.

■ In requesting a remand for the purpose of introducing the 1980 Census figures, appellant apparently believes that they would show larger statistical disparities, though he states only that they are "important." He overlooks at least two fundamental reasons for not granting the remand on this basis, however. First, while we recognize that there are inherent problems in using population figures which are only officially revised once every ten years, we have no comparable source available which is revised more frequently. In addition, demographic data change constantly, and some points must be chosen at which to compile, and to apply them: All data are no sooner taken than they begin to be outdated. Then, too, the summary of jury wheel composition prepared by the clerk of the district court was for the years 1977 through 1980; even if the 1980 Census figures were used, we would still have to make assumptions about the entire period based on data obtained in only one year. In short, the use of the 1980 Census, even though it was taken nearer in time to the selection of Yazzie's grand and petit juries, would not completely eliminate the estimation required by the nature of these cases. Furthermore, there is no reason to find that the 1970 Census figures were not substantial and relevant data on which to rely. The second point is that litigation must have an end sometime. When the district court considered the motion to dismiss the indictment, the taking of the 1980 Census was not completed, much less was the report ready to be referred to by the district court. Particularly when prima facie cases may be made by statistical showings, it would be inexcusably dilatory and would unjustifiably impair the necessary finality of judicial decisions to require the courts to reassess those decisions each time new statistics sprang up. We think this is no less true where the new statistics become available after a decision has been appealed.

■ The second ground asserted in support of the motion for remand is that the district court should hear additional evidence concerning the use of tribal rolls as supplemental sources of prospective jurors. 28 U.S.C.A. § 1863(b)(2) does indeed provide: "The plan shall prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862 of this title." Section 1861 declares "[i]t is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community . . . .", and § 1862 prohibits exclusion of jurors on account of race, color, religion, sex, national origin, or economic status. Thus, appellant attempts to voice a

statutory challenge to the District of New Mexico's jury selection plan in addition to his constitutional claims. However, the disparities shown here, as we have held, do not demonstrate a substantial underrepresentation or deviation from the fair-cross-section requirement under the Sixth Amendment. Neither do they demonstrate a violation of the Jury Selection and Service Act, which incorporates that fair-cross-section requirement in § 1861. That is, supplementation of voter lists by use of some other source of names is not necessary, where no substantial underrepresentation appears, because the policy and rights secured by §§ 1861 and 1862 are in fact being fostered and protected. Due to our ruling that supplementation of voter lists was not required in this instance, we will not remand the case to the district court for its consideration of tribal rolls as supplemental sources of names.

■ The last point urged in appellant's motion for remand involves the following allegations: Prior to and during the February evidentiary hearings on the motion to dismiss the indictment in this case, the United States was proceeding against the County of San Juan in a suit charging that the county's at-large voting system impermissibly diluted the vote of the American Indian residents and denied them access to the political process. The Clerk of San Juan County was one of those county clerks called by the government at the February 25 hearing to testify that there was no discrimination in registering Indians to vote. Appellant contends that because intentional discrimination against Indian voters was one of the issues which the United States sought to prove in its case against the county, the government presented evidence in the case at bar which was contrary to evidence it planned to present in the voting dilution suit. Appellant further alleges that the United States either knew or should have known of the conflict through the presence of an Assistant United States Attorney at the hearing on the motion to dismiss, who was also attorney of record for the government in the case against San Juan County. The failure to disclose the conflict to the court or opposing counsel, says appellant, was misconduct by the government warranting dismissal of the indictment, and a remand is necessary to allow the district court to reconsider its denial of the motion to dismiss in light of the "conflict" now revealed.

We first point out that the Supplemental Record on appeal discloses that the voting dilution suit against San Juan County was dismissed with prejudice by stipulation on April 8, 1980. That stipulation reads in part: "San Juan County has in the past undertaken and is presently undertaking in good faith effective measures to provide to all citizens equal access to and a meaningful opportunity to participate in the political process . . . ." The allegations of the United States in that case remained just that; they were never proven. Second, in this criminal case before us, the issue of underrepresentation of Indians on juries " . . . involves a comparison of the makeup of jury venires . . . with the makeup of the *community*, not of voter registration lists." *Duren, supra*, 439 U.S. at 365, 99 S.Ct. at 669, 58 L.Ed.2d at 587, fn. 23 (emphasis in original). Our determination here is simply unaffected by the percentage of Indians appearing on the lists of registered voters. Third, this is not a case of knowing misstatement of facts, use of perjured testimony, or failure to correct known misstatements of fact by a principal government witness in a single case, as were the cases cited in appellant's brief. The non-disclosure of this "conflict," which never even developed into inconsistent testimony presented by the government in two unrelated cases, on a matter immaterial to the disposition of the issue before us, was not misconduct by the prosecutor, and certainly does not warrant dismissal of the indictment here. There is therefore no basis for granting the motion for limited remand, and it is hereby denied.

### III. The Instructions

■ The first of the three instructions given by the district court and objected to by appellant reads:

If it is shown that the defendant used a deadly weapon in the commission of a homicide, then you may find, from the use of such weapon, in the absence of explanatory or mitigating circumstances, the existence of the malice which is an essential element of the offense. You are not obliged so to find, however.

A knife, as a matter of law, is a deadly weapon.

Appellant contends that whether the knife was a deadly weapon was a question of fact for the jury to determine, and was improperly treated as a question of law by the district court. We disagree. This does not involve, as did the cases cited by appellant, a crime of assault with a deadly or dangerous weapon, where it was properly left to the jury to determine whether a truck lug wrench, a metal and plastic chair, and a soda pop bottle were deadly weapons. In the present case, the knife in question had a blade at least five inches long. The district court did not err in determining that such a weapon was likely to cause death or serious bodily injury, nor in determining that no reasonable jury could find otherwise. The knife was therefore a deadly weapon as a matter of law, and the instruction as given was correct. See *Hockenberry v. United States*, 422 F.2d 171 (9th Cir. 1970).

■ Appellant also complains that the jury were erroneously instructed concerning the elements of involuntary manslaughter. We do not reach this issue, however. The jury were instructed that they should only consider the charge of involuntary manslaughter if they could not agree as to the guilt of the defendant as to voluntary manslaughter, or found him not guilty of that charge. They did in fact agree that Yazzie was guilty of voluntary manslaughter, and so were never required to consider the lesser included offense of involuntary manslaughter. Any possible error in the involuntary manslaughter instructions was nonprejudicial in consequence of Yazzie's conviction on the greater offense. *Hansborough v. United States*, 308 F.2d 645 (D.C. Cir.1962), at 646, fn. 2.

■ Finally, appellant asserts that the following portion of the instruction on intoxication was confusing and misleading, and therefore erroneous:

If you have a reasonable doubt from the evidence in the case whether, because of the degree of his intoxication, the mind of the defendant was capable of committing the crime with malice aforethought, you should acquit the defendant of second degree murder, but this would not be considered by you in connection with any lesser degree of the offense charged, as intoxication is not a defense to the charge of voluntary or involuntary manslaughter.

Appellant does not contend that voluntary intoxication is a defense to voluntary manslaughter, and indeed, it is not. *Kane v. United States*, 399 F.2d 730 (9th Cir. 1968), cert. den. 393 U.S. 1057, 89 S.Ct. 698, 21 L.Ed.2d 699. Rather, his objection is that intoxication is admissible evidence on a charge of voluntary manslaughter, to be considered by the jury in other respects than as a defense thereto, and the above instruction erroneously required the jury to disregard any evidence of intoxication for any purpose on the lesser included offenses.

Specifically, appellant contends that the jury should have been allowed to consider the evidence that Yazzie had been drinking before the stabbing in connection with the defense theories of self-defense and accident, the involuntary manslaughter instructions, and the following instruction given by the district court:

When a defendant voluntarily and intentionally offers an explanation to an investigating officer or makes some statement tending to show his innocence, and such explanation or statement is later shown to be false, you may consider whether such circumstantial evidence points to a consciousness of guilt. Ordinarily, it is reasonable to infer that an innocent person does not usually find it necessary to invent or fabricate an explanation or statement tending to establish his innocence. * * *

As we have stated, appellant was convicted of voluntary, not involuntary manslaughter, so it is unnecessary for us to consider the intoxication instruction as it affects the instructions on involuntary manslaughter. As for the other three points, appellant argues that the jury should have been permitted to consider the fact of his intoxication at the time of the incident: 1) on the theory of self-defense, as it affected his perception of imminent danger of death or serious bodily harm, and whether he was therefore justified in using deadly force; 2) on the theory of accident, as it affected his physical control during the incident; and 3) on the false statements of his innocence.

It appears to this Court that appellant would have us hold that while intoxication is not by itself a defense to voluntary manslaughter, it is nevertheless effective as an adjunct to other defenses such as self-defense and accident, or to attenuate the inference to be drawn from false statements of innocence by the accused. We are referred to no authority for this novel proposition, nor are we aware of any which supports it. The logic of the rule that intoxication is not a defense to a crime not involving specific intent dictates that it should not be available as a partial defense, effective in conjunction with others, nor should it reduce the importance of false explanations by the accused. In sum, we hold that intoxication is no defense at all to a charge of voluntary manslaughter, regardless of the manner of its attempted use. The district court did not err in so instructing the jury. The judgment of the district court is AFFIRMED.

## APPENDIX

### SUMMARY OF MASTER AND QUALIFIED JURY WHEELS
### COMPILED IN 1977–1980

#### MASTER JURY WHEEL

| | Questionnaires Mailed | Questionnaires Returned | Total Returned Undelivered | Total Disqualified or Excused During Initial Review | Total Placed in Qualified Jury Wheel |
|---|---|---|---|---|---|
| Albq/SFe | 8,993 | 6,578 | 2,342 | 1,991 | 4,587 |
| Las Cruces | 2,501 | 1,833 | 647 | 608 | 1,225 |
| Roswell | 2,479 | 1,890 | 575 | 635 | 1,255 |
| TOTAL FOR STATE | 13,973 | 10,301 | 3,564 | 3,234 | 7,067 |

| Albq/SFe | Questionnaires Returned | % of Questionnaires Returned | No. Found Qualified | % of Total Qualified In Division | % of 1970 Census over 18 in Div. | % of 1970 Census all Ages in Div |
|---|---|---|---|---|---|---|
| White | 6189 | 94.1 % | 4320 | 94.17% | 89.54% | 87.45% |
| Black | 45 | .68 | 39 | .85 | 1.19 | 1.28 |
| Indian | 318 | 4.82 | 210 | 4.58 | 9.27 | 10.56 |
| Other | 26 | .4 | 18 | .40 | ____ | .71 |
| TOTAL | 6578 | | 4587/69.73% | | | |
| **Las Cruces** | | | | | | |
| White | 1800 | 92.2 % | 1203 | 98.2 % | 95.87% | 95.55% |
| Black | 15 | .82 | 10 | .82 | 2.10 | 2.28 |
| Indian | 11 | .6 | 8 | .65 | 2.03 | 1.25 |
| Other | 7 | .38 | 4 | .33 | ____ | .92 |
| TOTAL | 1833 | | 1225/66.83% | | | |

| | Questionnaires Returned | % of Question-naires Returned | No. Found Qualified | % of Total Qualified In Division | % of 1970 Census over 18 in Div. | % of 1970 Census all Ages in Div. |
|---|---|---|---|---|---|---|
| Roswell | | | | | | |
| White | 1840 | 97.35% | 1220 | 97.21% | 95.51% | 94.76% |
| Black | 31 | 1.64 | 22 | 1.75 | 3.23 | 3.8 |
| Indian | 15 | .80 | 11 | .88 | 1.26 | .58 |
| Other | 4 | .21 | 2 | .16 | | .86 |
| TOTAL | 1890 | | 1255/66.40% | | | |
| | | | | | | |
| TOTAL FOR STATE | 10,301 | | 7,067 | | | |
| White | 9,829 | 95.42% | 6,743 | 95.42% | 91.74% | 90.1 % |
| Black | 91 | .88 | 71 | 1.01 | 1.75 | 1.9 |
| Indian | 344 | 3.34 | 229 | 3.23 | 6.51 | 7.2 |
| Other | 37 | .36 | 24 | .34 | | .8 |