**UNITED STATES of America, Plaintiff,**

v.

**Richard HAWORTH, et al., Defendants.**

**Criminal No. 95–0491 LH.**

United States District Court,
D. New Mexico.

Nov. 21, 1996.

Elizabeth M. Martinez, U.S. Attorney's Office, District New Mexico, Albuquerque, NM, for Plaintiff.

Marc H. Robert, Michael V. Davis, Billy R. Blackburn, Paul J. Kennedy, Albuquerque, NM, for Defendants.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS INDICTMENT

HANSEN, District Judge.

**THIS MATTER** comes before the Court on Defendant Bobby Barrios's Motion to Dismiss Indictment Because Jury Pool From Which Grand Jury Was Selected and Petit Jury Will Be Selected Systematically Excludes Hispanics and Others From Service (Docket No. 803), and on Defendant Haworth's Request for Deferral of Decision Regarding Defendant's Motion to Dismiss Indictment Due to Grand Jury Composition and Related Relief (Docket No. 945). The Court accepted Defendant Barrios's guilty plea after his motion was filed. Defendants Haworth and Spivey joined in Barrios's motion (Docket No. 834) and filed a supplement to the motion (Docket No. 903). Having considered the parties' memoranda and evidence submitted with their memoranda, the Court finds that an evidentiary hearing is not necessary. In addition, the Court finds that Defendant Barrios's motion and Defendant Haworth's request are not well taken and will be denied.

The original motion filed by Defendant Barrios alleged that the jury selection process in this district significantly under-represents Hispanics and certain unidentified "others," in violation of the Sixth Amendment, the Jury Selection and Service Act (JSSA), 28 U.S.C. §§ 1861 et seq., and the Fifth Amendment. The motion also sought leave to acquire additional data regarding the education and home ownership status of prospective jurors. In their joinder, Defendants Haworth and Spivey contended that the jury selection process also resulted in the under-representation of members of their age group, ages 29 to 37.

Following Defendant Barrios's guilty plea, Defendants Haworth and Spivey implicitly abandoned Barrios's Fifth Amendment equal protection claims, recognizing that they lack standing to assert such claims because they are not members of the protected groups allegedly under-represented, that is, Hispanics and Native Americans. *See Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272,

1280, 51 L.Ed.2d 498 (1977) (defendant must be member of distinctive group in order to assert equal protection challenge to under-representation of group). At a recent conference in chambers, Defendants explicitly abandoned their request for additional jury data regarding the age of prospective jurors. Since that conference, however, Defendant Haworth has reiterated his desire for additional data regarding the age, education and home ownership status of prospective jurors. Therefore, the Court will first address the request for additional statistical information. The Court will then analyze Defendants' substantive claims.

### Discovery Issue

■ Defendants have presented no evidence suggesting that persons under age 40, persons who have achieved certain education levels or persons who do or do not own their homes constitute distinctive groups which must necessarily be included in the fair cross section of the community from which juries are selected. A "distinctive group" for Sixth Amendment purposes must have qualities defining the group, cohesiveness, and a community of interest not represented by other groups in the community. *United States v. Test*, 550 F.2d 577, 591 (10th Cir.1976). There is no evidence regarding any of these attributes, and Defendants have not even argued that the groups in question are distinctive from the general population. Therefore, discovery of the requested data will be an exercise in futility. *See also Anaya v. Hansen*, 781 F.2d 1, 8 (1st Cir.1986) (less educated individuals are not a distinctive group); *United States v. Kleifgen*, 557 F.2d 1293, 1296 (9th Cir.1977) (same); *Ford v. Seabold*, 841 F.2d 677, 682 (6th Cir.), (young adults are not a distinctive group), *cert. denied*, 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988). The request for additional juror data is denied.

### Request for Deferral of Ruling

Defendants assert four primary grounds for their request that the Court defer ruling on the jury composition motion. They contend the decision should be deferred because: (1) the disparities found on the Las Cruces/Roswell division jury wheels will likely result in a district-wide change in the jury selection process; (2) Defendants still do not have the juror data regarding age, home ownership and education; (3) accurate disparities assessment depends on ascertaining which qualified jurors make up the pool of jurors who actually appear for jury service; and (4) this Court and the parties to this case should participate in the evidentiary hearing Judge Vásquez is conducting in connection with a similar jury composition challenge in *United States v. Gonzales*, Criminal No. 95–538. These asserted grounds are without merit.

■ First, the disparities on the Las Cruces/Roswell jury wheels are irrelevant to this inquiry, which involves the Albuquerque/Santa Fe division. *See, e.g., United States v. Bahna*, 68 F.3d 19, 24 (2nd Cir. 1995) (proper subject of analysis is division from which jury in question was drawn), *cert. denied*, — U.S. ——, 116 S.Ct. 1682, 134 L.Ed.2d 784 (1996). Second, the Court has denied Defendants' request for additional juror data. Third, the Tenth Circuit in *United States v. Yazzie*, 660 F.2d 422 (10th Cir.1981), *cert. denied*, 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 464 (1982) clearly sanctioned the use of the qualified wheel as the basis for analyzing absolute disparities. *Yazzie*, 660 F.2d at 427, 431. There is therefore no need to determine which qualified jurors appeared for service. Fourth, Defendants themselves admit that they lack standing to participate in the *Gonzales* hearing, and they cite no authority permitting the participation of this Court or the parties to this case.

### Substantive Claims

#### I. Background

##### A. The District's Jury Selection Plan

On December 2, 1988, all judges of this Court concurred in the adoption of a plan for the random selection of jurors pursuant to the JSSA. *See In re Amendment of the Court's Jury Plan*, Misc. No. 6175. According to the plan, the district is divided into three divisions, including the Albuquerque/Santa Fe division from which the grand jury in this case was selected and from which the petit jury will be selected. Voter registration lists are the source of all prospective

jurors. When the clerk of the court determines how many prospective jurors are needed in a particular division, that number of jurors is drawn randomly from voter registration lists. The names selected in this fashion make up the Master Jury Wheel. The clerk of the court then determines how many prospective jurors will be needed to create a qualified jury wheel and randomly selects that number. Each of the selected prospects is sent a questionnaire regarding juror qualifications. The questionnaire asks the recipient to identify his or her race as black, Asian, white, American Indian or other. It also asks the recipient whether he or she is Hispanic. When the questionnaires are returned, the clerk determines if each prospective juror is qualified and not exempt. Those that are qualified and not exempt make up the Qualified Juror Wheel. Jury panels are randomly selected from the Qualified Juror Wheel.

### B. Data From Applicable Jury Wheels

The grand jury in this case was drawn from the 1993 Qualified Juror Wheel for the Albuquerque/Santa Fe division, and the petit jury will be selected from the same division's 1995 Qualified Juror Wheel. The Tenth Circuit instructs us to look to the qualified jury wheel in analyzing jury composition challenges. *United States v. Yazzie*, 660 F.2d at 427, 431.

Defendants claim that the two groups substantially under-represented as a result of the jury selection process are Hispanics and Native Americans. The data from the 1993 and 1995 Qualified Wheels indicate the number of prospective jurors who identified themselves as Hispanic or Native American. However, 68 of the 1025 jurors on the 1993 Qualified Wheel, and 93 of the 1186 jurors on the 1995 Qualified Wheel did not indicate their race and/or whether they were Hispanic. Therefore, in analyzing the statistical data, the Court has excluded these unidentified jurors from the total number on each qualified wheel. *See, e.g., United States v. Biaggi*, 680 F.Supp. 641, 646 (S.D.N.Y.1988), *aff'd*, 909 F.2d 662 (2nd Cir.1990), *cert. denied*, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991). Thus, for purposes of the present analysis, the total number of jurors on the 1993 Qualified Wheel is 957 instead of 1025, and on the 1995 Qualified Wheel, 1093 instead of 1186.

The data from the relevant wheels are as follows:

|  | '93 Qualified Wheel | '95 Qualified Wheel |
|---|---|---|
| Hispanic | 28.11% *(269 of 957)* | 29.37% *(321 of 1093)* |
| Native American | 6.79% *(65 of 957)* | 6.86% *(75 of 1093)* |

Data from the 1990 Census indicate that Hispanics comprise 35.11% of the voter eligible population in the Albuquerque/Santa Fe division, and Native Americans comprise 10.05%. Therefore, the discrepancies between the relevant groups of jurors and the same groups in the population are as follows:

| DISCREPANCY (as compared to census figures) | '93 Qualified Wheel | '95 Qualified Wheel |
|---|---|---|
| Hispanic | - 7.00% | - 5.74% |
| Native American | - 3.26% | - 3.19% |

Defendants argue that the 1990 Census data are unreliable because the Census Bureau probably undercounted minority populations. In support of this argument, Defendants presented their expert's affidavit which relies on hearsay statements purportedly

made by the Census Bureau. The Court therefore has no reasonable basis for rejecting the 1990 Census figures. Even if Defendants had presented the actual Census Bureau statements, there does not appear to be any attempt to estimate the extent of the undercounting. Consequently, the Court has relied on the 1990 Census as the most accurate figures available. *See Duren v. Missouri,* 439 U.S. 357, 365, 99 S.Ct. 664, 669, 58 L.Ed.2d 579 (1979) (where there was no evidence suggesting census data were inaccurate, those data were sufficient for purposes of analyzing a fair cross section challenge).

## II. Analysis

### A. Fair Cross Section Challenge Under the Sixth Amendment

The Sixth Amendment guarantees a defendant the right to be tried by a jury drawn from a fair cross section of the community. *Taylor v. Louisiana,* 419 U.S. 522, 526–31, 95 S.Ct. 692, 695–98, 42 L.Ed.2d 690 (1975). If a defendant believes this right has been violated, he or she must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this under-representation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri,* 439 U.S. at 364, 99 S.Ct. at 668. Defendants have established the first prong of the test because Hispanics and Native Americans clearly are distinctive groups. *Castaneda v. Partida,* 430 U.S. 482, 495, 97 S.Ct. 1272, 1280–81, 51 L.Ed.2d 498 (1977) (Hispanics); *United States v. Yazzie,*

660 F.2d at 426 (Native Americans). However, Defendants have failed to establish the second and third prongs of the *Duren* test.

### 1. Fair and reasonable representation

In determining whether the representation of Hispanics and Native Americans on qualified jury wheels is "fair and reasonable," the Court looks to the absolute disparities between representation on jury wheels and representation in the general population. *United States v. Yazzie,* 660 F.2d at 427.[1] The Government argues that absolute disparities must be at least 10% before a defendant can hope to establish constitutionally significant under-representation. The case law does not entirely support the Government's position. The Tenth Circuit approves of a case by case evaluation, rather than a bright line objective standard. *United States v. Test,* 550 F.2d 577, 589 (10th Cir.1976).

Nevertheless, it is helpful to survey the absolute disparities other courts have found to be acceptable. The Third, Fourth and Sixth Circuits have found double-digit disparities to be tolerable in the context of Sixth Amendment jury composition challenges. *Ramseur v. Beyer,* 983 F.2d 1215 (3rd Cir. 1992) (14.6% disparity), *cert. denied,* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); *United States v. Lewis,* 10 F.3d 1086 (4th Cir.1993) (less than 20% disparity); *Ford v. Seabold,* 841 F.2d 677 (6th Cir.) (21.7% disparity), *cert. denied,* 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988). The First, Seventh and Eleventh Circuits have accepted disparities of between 7 and 10%. *United States v. Joost,* 1996 WL 480215 (1st Cir.) (7.13% disparity), *cert. denied,* — U.S. —, 117 S.Ct. 408, 136 L.Ed.2d 321 (1996); *John-*

---

**1.** Defendants contend that comparative disparity rather than absolute disparity analysis should be used with respect to Native Americans because they comprise such a small percentage of the general population. *See, e.g., United States v. Pleier,* 849 F.Supp. 1321, 1329 (D.Alaska 1994) (as supplement to absolute disparity analysis, it is proper to utilize comparative disparity when considering representation of group comprising only 14.5% of the general population). However, even if comparative disparity is employed, the comparative disparity for Native Americans is only 31.44% for the 1993 qualified jury wheel (3.16% divided by 10.05%) and 32.44% for the 1995 wheel (3.26% divided by 10.05%). Courts

have viewed similar comparative disparity values as being insignificant. *See United States v. Yazzie,* 660 F.2d at 427 (approving comparative disparity of 46.3%); *Johnson v. McCaughtry,* 92 F.3d 585 (7th Cir.1996) (approving comparative disparity of 40%); *United States v. Rogers,* 73 F.3d 774 (8th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 1889, 135 L.Ed.2d 183 (1996) (approving comparative disparity of 30.96%); *United States v. Sanchez–Lopez,* 879 F.2d 541, 548 (9th Cir.1989) (approving comparative disparity of 52.9%). This Court agrees, especially given the Tenth Circuit's admonishment in *Yazzie* to employ absolute disparities.

*son v. McCaughtry,* 92 F.3d 585 (7th Cir. 1996) (9% disparity); *United States v. Grisham,* 63 F.3d 1074 (11th Cir.1995) (less than 10% disparity).

On the other hand, one district court dismissed an indictment where the absolute disparity was only 4.30%, *United States v. Osorio,* 801 F.Supp. 966 (D.Conn.1992), and the Second Circuit found a disparity of 4.7% to be on the borderline of acceptable discrepancies. *United States v. Biaggi,* 909 F.2d 662 (2nd Cir.1990), *cert. denied,* 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991). However, the *Osorio* court dismissed the indictment not because of the statistical disparity, but because the selection process resulted in the nearly total exclusion of potential jurors from the two largest cities in the division. *Osorio,* 801 F.Supp. at 978–79.

The largest disparity yet before the Tenth Circuit was 8.4%, in *United States v. Edwards,* 69 F.3d 419 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996), and the court rejected the defendant's Sixth Amendment challenge. However, the basis for the court's rejection was the defendant's failure to establish the third "systematic exclusion" prong of *Duren;* the court did not indicate whether 8.4% disparity was acceptable or not. In other cases, the Tenth Circuit has found disparities as great as 4% to be acceptable. *United States v. Yazzie; United States v. Test.*

If any general conclusions can be drawn from these cases, it appears that disparities of up to 20% may well be tolerated in a jury selection plan, providing there is no evidence that the disparities are the result of systematic exclusion. The reason for this tolerance lies in the rationale underlying the Sixth Amendment's fair cross section requirement.

"The Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a representative jury (which the Constitution does not demand), but an impartial one (which it does)." *Holland v. Illinois,* 493 U.S. 474, 480, 110 S.Ct. 803, 807, 107 L.Ed.2d 905 (1990). Impartiality is more likely if the jury venire is broadly representative of all segments of a community. *Taylor v. Louisiana,* 419 U.S. 522, 530–31, 95 S.Ct. 692, 697–98, 42 L.Ed.2d 690 (1975).

This does not mean, however, that a defendant is entitled to a jury that mirrors the proportions of distinct groups in the population. "[T]he Sixth Amendment guarantees only the opportunity for a representative jury, not a representative jury itself." *United States v. Osorio,* 801 F.Supp. at 975.

Thus, the question is: At what point does the under-representation of a distinctive group begin to infringe on the *opportunity* to obtain a representative jury? The laws of probability ensure that a random selection process will almost never result in a precise mirror image of the pool from which the selection is made. The disparities we see in the 1993 and 1995 qualified jury wheels, less than 4% for Native Americans and 7% or less for Hispanics, do not leap out as the type of major discrepancies that might have a serious impact on a jury venire's capacity for impartiality. To the contrary, the jury wheels in question seem to this Court to be fair and reasonably representative of the community, which is all that is constitutionally required. *Duren v. Missouri,* 439 U.S. at 364, 99 S.Ct. at 668–69; *United States v. Test,* 550 F.2d at 590. The wheels clearly provided the defendants with the opportunity to have a representative grand jury, and they will provide them with the opportunity to have a representative petit jury.

### 2. Systematic exclusion

■ Before deciding conclusively that Defendants have failed to establish *prima facie* evidence of a fair cross section violation, the Court must examine the third *Duren* prong, whether there is any systematic exclusion of either Hispanics or Native Americans inherent in the jury selection process. Indeed, the second and third *Duren* prongs seem to be intertwined. A percentage disparity, which by itself does not appear to be significant, may be magnified into a discrepancy of constitutional proportions if the process of selecting the venire is something other than random, or if the process causes the exclusion of particular groups. For example, in *Osorio,* disparities of between three and five percent were not particularly significant. However, the disparities became meaningful enough to warrant dismissal of the indict-

ment when it became clear that not one juror questionnaire had been mailed to a any resident of either of the two largest cities in Connecticut. As it happened, the excluded cities also had the largest minority populations. *Osorio,* 801 F.Supp. at 972.

Conversely, disparities which initially may appear significant may lose impact in light of the objective selection process used. For example, in *Biaggi,* 3.6% and 4.7% absolute disparities were, in the court's opinion, at the limit of acceptable disparities. The court "would find the Sixth Amendment issue extremely close if the under-representations had resulted from any circumstance less benign than use of voter registration lists. Nevertheless, we agree with the conclusion reached by the District Court and reject the Sixth Amendment challenge." *Biaggi,* 909 F.2d at 678.

In the present case, Defendants have not established a systematic exclusion of Hispanics and Native Americans. Although Defendants contend that minorities do not register to vote in the same proportion as do non-minorities, they do not offer any compelling evidence of this hypothesis. Instead, they rely on Brian Sanderoff's affidavit, which in turn relies on data from unidentified sources regarding the number of registered voters in predominantly white, Hispanic and Native American voting districts. The data are not very useful because they report only the percentage of the whole population comprising registered voters, not the percentage of the relevant minority population comprising registered voters. Thus, in the Court's view, the data are not reliable and tell us nothing about whether minorities do or do not tend to register to vote in proportions similar to the number of non-minorities who register to vote.

However, even if Mr. Sanderoff's statistics were reliable and we could assume the validity of his hypothesis, the fact of low voter-registration among minorities is not the same as the "systematic exclusion" required by *Duren.* Defendants have presented no evidence suggesting that Hispanics or Native Americans are prevented from registering to vote. *See United States v. Lewis,* 10 F.3d 1086, 1090 (4th Cir.1993) (when the right to

register to vote is open, defendant has no basis for criticizing selection process); *Floyd v. Garrison,* 996 F.2d 947 (8th Cir.1993) (same). As the court in *Osorio* noted, "A jury selection system that relies on voter registration lists does not systematically exclude [minorities] as long as there is no discrimination in the compilation of the voter registration lists and 'all parts of the process are done by random selection.'" *United States v. Osorio,* 801 F.Supp. at 978, *quoting United States v. Young,* 822 F.2d 1234, 1239 (2d Cir.1987).

Scrutiny of the jury selection process pursuant to the Sixth Amendment focuses more on the concept of the fairness of the jury system than on a defendant's individual rights. *Ramseur v. Beyer,* 983 F.2d at 1234. Thus, the inquiry is properly whether the procedure employed is fair, not on whether the outcome of the process is precisely reflective of the community. *United States v. Osorio,* 801 F.Supp. at 975. Given the evidence presented, there can be no doubt that the jury selection process employed in this case is a fair and reasonable procedure likely to ensure fair and impartial juries.

## B. Challenge Under Jury Selection and Service Act

Defendants also challenge the district's jury selection process under the JSSA. The Act in effect codifies the Sixth Amendment's fair cross section requirement, and it requires each district court to devise a plan for the random selection of jurors. 28 U.S.C. §§ 1861–1862. The Act contemplates that selection will ordinarily be made from lists of registered voters or actual voters, and that such lists will be supplemented by other sources where necessary to assure compliance with the fair cross section requirement. 28 U.S.C. § 1863(b)(2).

The Tenth Circuit has held that the standards set forth in the Act are the equivalent of the fair cross section standards under the Sixth Amendment. *United States v. Test,* 550 F.2d at 588. Therefore, the *Duren* analysis above establishes that Defendants have also failed to show a violation of the JSSA. Furthermore, under the JSSA, resort to

sources other than voter registration lists "is the exception, not the rule, and absent a showing of deficient representation the use of an approved jury selection process [i.e., lists of actual voters] is lawful." *United States v. Bennett,* 539 F.2d 45, 55 (10th Cir.), *cert. denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976) (citations omitted). The representation of Hispanics and Native Americans on the 1993 and 1995 qualified jury wheels is hardly deficient. The representation of these minorities seems fair and reasonable and provides the opportunity for selecting representative juries.

Even if this Court believed a different jury selection process would be better, absent a showing of constitutional infirmity, this Court is unwilling to take upon itself the unilateral revision of the district's jury selection procedure, which was approved unanimously in 1988 by all the district judges then sitting. If any changes are to be made in the present, constitutionally acceptable selection process, those changes should be implemented only when the majority of the district's active judges agree.

### C. Necessity for Evidentiary Hearing

Defendants asked for an evidentiary hearing on the issues raised by their motions in order to "develop" the evidence regarding minorities' under-representation on voter registration lists and the undercounting of minorities by the Census Bureau. While an evidentiary hearing may well provide parties the opportunity to develop evidence, the underlying motion should present enough of the evidence to establish that there are factual issues which must necessarily be decided in order to rule on the motion. *See United States v. Chavez–Marquez,* 66 F.3d 259, 261 (10th Cir.1995) (evidentiary hearing is warranted by specific allegations establishing issues of fact). Here, Defendants have presented no competent evidence providing any basis for their broad conclusions about the under-representation of minorities in the census. The only evidence provided consists of hearsay statistics relied on by Brian Sanderoff. This is not enough. With respect to under-representation on voter rolls, even if Defendants established this fact at a hearing,

as discussed above, the Court's decision would be the same. The request for an evidentiary hearing is denied.

**IT IS, THEREFORE, ORDERED** that Defendants' Motion to Dismiss Indictment Because Jury Pool From Which Grand Jury Was Selected and Petit Jury Will Be Selected Systematically Excludes Hispanics and Others From Service (Docket No. 803), and Defendant Haworth's Request for Deferral of Decision Regarding Defendant's Motion to Dismiss Indictment Due to Grand Jury Composition and Related Relief (Docket No. 945) are **denied.**