UNITED STATES of America, Plaintiff,

v.

Anthony GAULT, a/k/a Arthur
Hughes, Defendant.

No. CR 95–229 JP.

United States District Court,
D. New Mexico.

April 1, 1997.

Joseph W. Gandert, Fed. Public Defender's Office, Albuquerque, NM, for Defendant.

Charles L. Barth, U.S. Atty., for U.S.

## MEMORANDUM OPINION
## AND ORDER

PARKER, District Judge.

The subject of this Memorandum Opinion and Order is defendant's "Motion to Select Jurors from a Constitutionally Representa-

tive Venire" (Doc. No. 66 ), filed December 16, 1996. After thoroughly reviewing all of the relevant evidence before me, I conclude that defendant's motion should be denied.

## I. BACKGROUND

### A. Defendant's Motion

#### 1. The Context in which Defendant's Motion Arose

On December 9, 1996, after a jury was selected for defendant's trial, but before the jury was sworn, counsel for defendant orally moved the Court to dismiss the jury. Defendant wished to have an opportunity to present evidence that the jury selection process in the United States District Court for the District of New Mexico ("the District") systematically and arbitrarily excludes people of color [1] from jury service. I dismissed the jury, postponed the trial, and allowed the parties to submit briefs on the issue of the constitutionality of the jury selection process in the District. After the parties submitted briefs, I scheduled an evidentiary hearing to take place on January 6, 1997. The parties requested permission to submit the transcripts of testimony and defendant's Exhibits 1265 A–R and government's Exhibits 1–10 from an evidentiary hearing held before the Honorable Martha Vázquez on November 26 and November 27, 1996, in the on-going case of *U.S. v. Cesar Gonzales,* No. Cr. 95–0538, U.S. District Court for the District of New Mexico, in lieu of an evidentiary hearing before me. At the November *Gonzales* hearing, evidence was presented on a range of issues pertaining to the District's jury selection plan and Hispanic and American Indian representation in the jury pools of the Albuquerque/Santa Fe, Roswell and Las Cruces Divisions, in relation to their numbers in the general population.

In addition to the transcript of the November *Gonzales* evidentiary hearing and the related exhibits, the only other evidence furnished by the parties in this case is the affidavit of Elizabeth Martinez, and Exhibits A–L to that affidavit.

#### 2. The Content of Defendant's Motion

Mr. Hughes argues that the current system for selecting jurors systematically excludes Hispanics, American Indians,[2] and Blacks from the jury selection process in the Albuquerque/Santa Fe Division.[3] Mr. Hughes contends that this exclusion violates the Sixth Amendment's right to a representative jury and the Fifth Amendment's equal protection clause. Some of the issues raised during the course of the November *Gonzales* hearing were not mentioned by Mr. Hughes or the government in their briefs. This opinion addresses only the arguments specifically presented in the briefs in this case.

Mr. Hughes only challenges the jury selection process in the Albuquerque/Santa Fe Division of the District. Hence, I have not considered whether the District's jury selection plan has resulted in a constitutionally unacceptable representation of Hispanics, Blacks and/or American Indians in jury venires in the Las Cruces and Roswell Divisions.

I base my conclusion that Mr. Hughes' motion should be denied upon a thorough review of the relevant portions of the November Gonzales hearing transcripts, the affidavit of Elizabeth Martinez, the exhibits at-

---

1. The defendant has not specifically defined the phrase "people of color." My understanding, from the context of defendant's motion and supporting brief, is that by "people of color" defendant means Hispanics, American Indians and Blacks.

2. Both Mr. Hughes and the government referred to "Native Americans" in their briefs. "American Indian" is the term used for the identification of this racial group in the District's current "Juror Qualification Questionnaire" forms. Data regarding the racial composition of jury pools was extracted from these forms. Therefore, I will use the term "American Indian," rather than "Native American," throughout this opinion.

3. Mr. Hughes also states, "Pending further investigation, Hughes may also make this same motion based on the systematic exclusion of people based on age, education level and/or socioeconomic status.... Hughes may raise challenges to the venire selection process on the grounds that such groups have also been excluded, should further investigation disclose facts warranting such a challenge." The United States Court of Appeals for the Tenth Circuit has established that a "distinctive group" for Sixth Amendment purposes must have definitive qualities, cohesiveness and a community of interest not represented by other groups. *United States v. Test,* 550 F.2d 577, 591 (10th Cir.1976). Mr. Hughes has presented no evidence whatsoever about these groups. Therefore, my opinion does not address these potential challenges.

tached to the transcript and the affidavit, and matters of which I take judicial notice.

## B. The Jury Selection Process in the District

Although the parties did not present information about the history of the District's jury selection process, I take judicial notice of that history. On August 14, 1968, in compliance with the Jury Selection and Service Act of 1968, 28 U.S.C. § 1861, et seq., the District Court judges for the District adopted a "Plan for Random Selection of Jurors." This plan has been amended several times. The most significant change occurred on July 10, 1978. The 1968 plan presumed that members of certain professions or occupations and persons residing far from the court[4] would suffer undue hardship or extreme inconvenience and that requiring them to serve on juries would be "inconsistent with the Act." Hence, the 1968 plan provided for automatic excusal from jury service by the Chief Judge upon request by a member of one of these groups. The July 10, 1978 modification of the plan essentially eliminated areas of automatic excusal, thereby, in effect, dispelling elements of subjectivity, making the plan more objective and providing court staff and judges with less opportunity to excuse people. Another amendment to the plan, on July 16, 1984, stated that the "master jury wheel for each division shall be emptied and refilled every two years. . . ." Previously, under the 1968 plan, the wheel had been emptied every four years.

The current plan is largely a reflection of the 1968 plan with the amendments noted above and other minor changes which have no substantive effect on the issues before me. Under the plan there are three divisions in the District of New Mexico: Albuquer-que/Santa Fe, Roswell, and Las Cruces. Prospective jurors within the Albuquerque/Santa Fe Division are selected from voting registration rolls from the following New Mexico counties: Bernalillo, Catron, Cibola, Colfax, Guadalupe, Harding, Los Alamos, McKinley, Mora, Quay, Rio Arriba, Sandoval, San Juan, San Miguel, Santa Fe, Socorro, Taos, Torrance, Union and Valencia.

Under the plan, persons are selected for jury service in the following manner. The Court Clerk ("clerk") determines a total number of jurors needed for a particular division of the District—Albuquerque/Santa Fe in this case. In open court, one of the District's judges draws a "starting number." An "increment number" is arrived at by dividing the total number of jurors needed into the total number of people appearing on the list of all registered voters in the Division. The "starting number" and the "increment number" are used to identify names, from among those on the list of all registered voters in a division, which then are included in a "Master Juror Wheel." The "Master Juror Wheel" consists of all persons whose names fall at multiples of the "increment number," beginning with, and including, the "starting number." For example, if the "starting number" is 11, and the "increment number" is 8, then the names on the Division's voter list corresponding to the numbers 11, 19, 27, 35 and so forth would be placed in the Master Juror Wheel.

Form A0904 juror questionnaires[5] are sent to every person whose name appears in the Master Juror Wheel. Question No. 11(A) of Form A0904 asks the recipient to identify the person's race as "Black," "Asian," "White," "American Indian," or "Other." Question No. 11(B) asks the recipient to answer yes or no to the question, "Are you Hispanic?"[6]

---

**4.** The exempted occupations and professions included school teachers, ministers, attorneys, and physicians. People residing more than 150 miles from the place of "holding court" were also exempted.

**5.** A copy of Form A0904, which was sent to persons who were included in the 1993 and 1995 Master Jury Wheels, is attached to this Memorandum Opinion and Order.

**6.** I take judicial notice that this question has changed with the evolution of the juror question-naire form. At one time the District used Form AO–178 on which the race question read: "Please indicate your race on the following list: Indian, Oriental, Black, White, Other (Specify)." Form AO–178 did not specifically ask the recipient whether she or he is Hispanic. A person filling out Form AO–178 would have to write in "Hispanic" as a specification of "Other." The questionnaire appeared to go to the opposite polarity with Form A6700, a more recent version of the form currently in use, in which the race question read as follows: "Fill in the circle com-

The names of the registered voters who return the questionnaires and who are not disqualified, not excused, and not exempted,[7] are then placed in each division's "Qualified Juror Wheel."[8] All grand and petit juries for a division come from that particular division's Qualified Juror Wheel. The clerk, periodically, as needed, selects a group of jurors from the Qualified Juror Wheel on a random basis.[9] The clerk mails voir dire forms[10] to the qualified jurors who are randomly selected.

## C. Statistical Data

The petit jury in this case was selected from the 1995 Qualified Juror Wheel for the Albuquerque/Santa Fe Division. The Tenth Circuit instructs judges, who analyze jury composition challenges, to look to the appropriate Qualified Juror Wheel. *United States v. Yazzie*, 660 F.2d 422, 427, 431 (10th Cir. 1981), *cert. denied*, 455 U.S. 923, 102 S.Ct. 1282, 71 L.Ed.2d 464 (1982).

The chart, *infra*, summarizes the relevant data underlying Mr. Hughes' motion. Column I identifies the groups which Mr. Hughes contends have been substantially underrepresented in the District's jury selection process and the pertinent years—1993 and 1995—for which the court was given data.

Column II gives the percentages of each group in the 1993 and 1995 Qualified Juror Wheels. Importantly, 68 of the 1025 persons included in the 1993 Qualified Juror Wheel and 93 of the 1186 in the 1995 Qualified Juror Wheel did not (1) identify their race in answer to Question No. 11(A), and (2) either did not answer, or answered "no," to Question No. 11(B), regarding whether they are Hispanic. In arriving at the percentages listed in Column II, I excluded these unidentified jurors from the total number in each Qualified Juror Wheel. *See U.S. v. Haworth*, 948 F.Supp. 981, 984 (D.N.M. 1996) (Judge C. Leroy Hansen) (also excluding the unidentified jurors). I calculated the percentages shown in Column II by using a total number of 957 for 1993 and a total of 1093 for 1995.

I excluded the unidentified jurors for several reasons. First, Alok Bohara, the only expert in statistics who testified at the November *Gonzales* hearing, stated that it is the standard practice of statisticians to exclude the missing or unidentified category in cases like this in which the focus is on a variable such as race and/or ethnicity. Second, to include the unidentified jurors in the totals would produce inaccurate results because it would assume that, for a particular racial or ethnic category, none of the unidentified jurors fell within that category. There is no reliable way of determining, from the

---

pletely which best describes your race." The choices were: "White Non–Hispanic," "White Hispanic," "Black Non–Hispanic," "Black Hispanic," "Asian/Oriental," "American Indian," and "Other (Specify on Reverse Side)."

**7.** To be qualified for service a person must be a citizen over the age of 18, must have resided in New Mexico for a full year, must be able to speak, read, write and understand the English language, and must not have a felony record. A person may be excused from service for a number of reasons. For example, a person who is over the age of 70, or who has served as a grand or petit juror in the past two years, or who is a volunteer firefighter, member of a rescue squad or member of an ambulance crew may be excused. The clerk may grant a permanent excusal from jury service for a person with a medical condition, but only if supported by a doctor's certification. Otherwise, a permanent excusal from jury service based on a claim of undue hardship or extreme inconvenience may be granted only by the judge presiding over selection of a particular jury panel. Exemptions are granted for full-time elected public officials, peo-

ple in the military, full-time Fire Department employees, and members of the police force.

**8.** Testimony by Paul Greenberg of the Computer Information and Resources Technologies during the November *Gonzales* evidentiary hearing indicated that the total number of people in the Qualified Juror Wheel is not a constant. Until the time a Master Juror Wheel is retired, additional juror questionnaires could be returned and more jurors could be added to that Qualified Juror Wheel.

**9.** The clerk essentially repeats the same process noted above. The total number of names remaining on the Qualified Juror Wheel is divided by the number of jurors needed to arrive at an increment. After a starting number is randomly drawn, jurors are selected in increments from that starting number.

**10.** A copy of the voir dire form which was mailed to persons who were randomly selected from the 1993 and 1995 Qualified Jury Wheel is attached to this opinion.

evidence in this case, the racial and ethnic composition of people who did not identify themselves as being members of specific racial groups and/or Hispanic. Intuitively, it makes more sense to assume that those who did not identify themselves are likely to be in racial or ethnic percentages roughly the same as those who did.

Column III lists the percentages of the over-eighteen years of age Hispanics and American Indians in the total 1990 population of the Albuquerque/Santa Fe Division according to the 1990 census figures for that division. Mr. Hughes provided the percentage of 1.85% for Blacks, as shown in Column III. This figure of 1.85% represents the percentage of Blacks, over 18 years old, in the total 1990 statewide population of New Mexico according to the 1990 census. The parties did not submit evidence of the percentage of Blacks in the Albuquerque/Santa Fe Division. Instead, the parties seem to have agreed that the statewide percentage of Blacks, 1.85%, should be used in this case. In my analysis I rely on the 1990 census figures because they appear to be the most accurate currently available.

■ Testimony by Brian Sanderoff at the November *Gonzales* hearing suggested that the use of 1990 census data may lead to an understatement of the disparity between population and Qualified Juror Wheel percentages. He indicated that the Census Bureau has acknowledged that New Mexico's actual population may have been undercounted in the 1990 census by as much as 3.5%. Mr. Sanderoff also testified that the Census Bureau Report noted that it is likely that the extent of the undercounting was greater among minority groups. However, neither Mr. Sanderoff nor any other witness attempted to quantify the extent to which any racial or ethnic group may have been undercounted in the 1990 census. No other evidence submitted by the parties provides this information.

On the other hand, certain factors imply that use of the 1990 census data may overstate the disparity because a significant part of a particular racial or ethnic group, while counted in the census, may not be eligible for jury service. Brian Sanderoff testified that the census numbers include individuals who are non-citizens, a category of persons who are ineligible for either voter registration or jury service. Also, the census numbers probably include many people who would be disqualified from jury duty because of an inability to speak, read and write English. At the November *Gonzales* hearing, Alok Bohara testified that his research has indicated that 19% of "Mexican Americans" residing in the southwestern area of the United States "have a hard time speaking English," i.e. either speak some English or none at all. However, the parties produced no evidence tending to show how large a percentage of any group, although included in the census data, would not be qualified to serve on a jury. I conclude that, in the absence of more precise information about census undercounting or the percentage of racial or ethnic groups not eligible for jury service, the most reasonable, prudent approach is to use the raw census data, which gives the most reliable statistics in the record. *See Duren v. Missouri,* 439 U.S. 357, 365, 99 S.Ct. 664, 669, 58 L.Ed.2d 579 (1979) (absent evidence in the record that census figures "significantly distorted" the relevant percentage, that data is adequate for analyzing fair cross section challenge).

■ Column IV shows the 1993 and 1995 absolute disparity figures for each of the relevant groups. Absolute disparity is the difference between the percentage of a group in the adult population and the percentage of that group in the Qualified Juror Wheel. The amount of absolute disparity for a specific group in a particular year is obtained by subtracting the pertinent figure in Column II from the corresponding figure in Column III. The absolute disparity figure is the "starting place" for determining whether the representation of a minority group in a juror wheel is "fair and reasonable" when compared to that group's representation in the general population. *Yazzie,* 660 F.2d at 427.

■ Column V lists the comparative disparities for each group in 1993 and 1995. This figure is the quotient resulting from dividing the absolute disparity figure in Column IV by the corresponding percentage of population figure in Column III. Courts use these comparative disparity numbers as a supplemental aid in determining whether the

representation of groups that comprise a relatively small percentage of the population, e.g. Blacks and American Indians in New Mexico, is "fair and reasonable" in juror wheels. *See Test,* 550 F.2d at 588–589 (examining both the absolute disparity and comparative disparity modes of comparison to determine proportional representation); *Ramseur v. Beyer,* 983 F.2d 1215, 1231 (3d Cir.1992) (utilizing comparative disparity figures as an aid in determining whether a nonrandom disparity existed), *cert. denied* 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993); *United States v. Rogers,* 73 F.3d 774, 776–777 (8th Cir:1996) (recognizing that the comparative disparity number is a "more meaningful measure of systematic impact" vis-a-vis the distinctive group of African Americans where their representation in the community at large is only 1.87%).

### 1993 & 1995 ALBUQUERQUE/SANTA FE DIVISION

| I<br>Ethnicity/Race<br>Year | II<br>% Qualified<br>Juror Wheel | III<br>% of 1990 Census<br>Over 18 in Division | IV<br>Absolute<br>Disparity | V<br>Comparative<br>Disparity |
|---|---|---|---|---|
| **Hispanic** | | | | |
| 1993 | 28.11% | 35.11% | 7.00% | 19.94% |
| 1995 | 29.37% | 35.11% | 5.74% | 16.35% |
| **American Indian** | | | | |
| 1993 | 6.79% | 10.05% | 3.26% | 32.44% |
| 1995 | 6.86% | 10.05% | 3.19% | 31.74% |
| **Black** | | | | |
| 1993 | 1.57% | 1.85% | .28% | 15.14% |
| 1995 | 1.19% | 1.85% | .66% | 35.68% |

The opinion in *Yazzie* reports certain statistical data regarding American Indian representation in the Albuquerque/Santa Fe Qualified Juror Wheel. In *Yazzie,* the defendant challenged the representation of American Indians on his petit jury which was selected from the 1977 Albuquerque/Santa Fe Division Qualified Juror Wheel, and the representation of American Indians on the grand jury that indicted him, which was drawn from the 1977 statewide Qualified Juror Wheel. Although the parties did not present actual 1970 census data or data reflecting the percentage of American Indians on the 1977 Qualified Juror Wheels, the opinion in *Yazzie* provides absolute and comparative disparity figures. The *Yazzie* opinion reveals that, as to the 1977 Qualified Juror Wheel in the Albuquerque/Santa Fe Division, the absolute disparity for American Indians was 4.29% and the comparative disparity was 46.3%. *Yazzie,* 660 F.2d at 427.

## II. ANALYSIS

### A. Fair Cross Section (FCS) Requirement of the Sixth Amendment

The Sixth Amendment requires that jurors be drawn from pools that represent a "fair cross section" of the community. Jury selection plans must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative of that community. *See, e.g,. Duren v. Missouri,* 439 U.S. 357, 363–364, 99 S.Ct. 664, 668–69, 58 L.Ed.2d 579 (1979) (quoting from *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975): "[J]ury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."). The assessment of whether juror wheels are "reasonably representative" must be made in light of the "well-settled rule that a defendant has no right to a grand or petit jury of any given demographic composition." *Yazzie,* 660 F.2d at 426. There is no requirement that a fair cross section be the mirror image of the community from which a jury is

drawn. *Taylor v. Louisiana,* 419 U.S. at 538, 95 S.Ct. at 701–02. The finding that numerical discrepancies are statistically significant does not require a finding that the deviations are legally significant and/or violate constitutional standards. *Test,* 550 F.2d at 584. The United States Court of Appeals for the Tenth Circuit has said that courts must determine whether statistical departures are "legally substantial." *Test,* 550 F.2d at 589. Courts must do this on a case by case basis. *Id.* However, courts may use the "collective experience of the courts" in performing this task. *Id.*

In order to demonstrate a violation of the fair cross section requirement of the Sixth Amendment, a defendant must show:

(1) that the group alleged to be excluded is a "distinctive" group in the community;

(2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of [the group's members] in the community; and

(3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Yazzie,* 660 F.2d at 425–426 (citing *Duren,* 439 U.S. at 364).

The government concedes that Mr. Hughes has met the first prong of the test; Hispanics, American Indians and Blacks are distinctive groups in the community. However, the government contends that Mr. Hughes has failed to satisfy the other prongs of the test. I agree. Mr. Hughes has not shown a disparity that is so "gross" or "marked" as to reflect a representation of Hispanics, American Indians and Blacks that is unfair and unreasonable or a "systematic exclusion of people of color." *See Test,* 550 F.2d at 590 (noting that Congress and "the courts" have concluded that "only 'gross' or 'marked' disparities or 'substantial' departures from a 'fair cross section' of the community require judicial intervention.").

Apparently, the Tenth Circuit has not addressed a factual situation like the one in this case with absolute disparities ranging from .28% to 7% and comparative disparities between 15.14% and 35.68%. In *United States v. Edwards,* 69 F.3d 419 (10th Cir.1995) the absolute disparity figure for "African Americans" was 8.3%. The court noted that the defendant failed to establish the systematic exclusion prong of the *Duren* test, and rejected the defendant's Sixth Amendment challenge.[11] The court did not reach the issue of whether the 8.3% absolute disparity was acceptable. In decisions prior to *Edwards,* the Tenth Circuit had found absolute disparities of up to 4% to be acceptable. *See Test,* 550 F.2d at 587; *Yazzie,* 660 F.2d at 426–428. The Tenth Circuit has also found a comparative disparity of up to 46% to be constitutionally permissible. *See Yazzie,* 660 F.2d at 427–428.

Mr. Hughes' Sixth Amendment argument is similar to one that the Honorable C. Leroy Hansen recently addressed in the ongoing case of *U.S. v. Haworth,* 948 F.Supp. 981 (D.N.M.1996). In *Haworth,* the defendants alleged that Hispanics and American Indians were substantially underrepresented in the 1993 and 1995 Albuquerque/Santa Fe Division Qualified Juror Wheels. Judge Hansen, after thoroughly considering the relevant law and the parties' briefs held that the District's system for selecting jurors does not violate the Sixth Amendment.

*In Haworth,* Judge Hansen surveyed the holdings of other circuits and noted that "[t]he Third, Fourth and Sixth Circuits have found double-digit disparities to be tolerable in the context of Sixth Amendment jury composition challenges. The First, Seventh and Eleventh Circuits have accepted disparities of between 7 and 10%." *Haworth,* 948 F.Supp. at 985 (citations omitted). Judge Hansen explained, "The reason for this tolerance lies in the rationale underlying the Sixth Amendment's fair cross section requirement.... [T]he question is: At what point does the underrepresentation of a distinctive group begin to infringe on the *opportunity* to obtain a representative jury?" *Haworth,* 948

---

11. In *Edwards,* the record was not nearly as well developed as is the record in this case. The defendant in *Edwards* did not present statistics regarding the composition of the relevant Qualified Jury Wheel or pertinent information about voting age population. Rather, the defendant merely noted that "zero-percent African Americans are summoned for the [seventy person] jury venire" and contended in his reply brief that "African Americans comprise approximately 8.3% of the population in Tulsa." *Edwards,* 69 F.3d at 436.

F.Supp. at 986 (emphasis in original). I agree with Judge Hansen's conclusion that:

> [t]he disparities we see in the 1993 and 1995 qualified jury wheels [for the Albuquerque/Santa Fe Division], less than 4% for Native Americans and 7% or less for Hispanics, do not leap out as the type of major discrepancies that might have a serious impact on a jury venire's capacity for impartiality. To the contrary, the jury wheels in question seem to this Court to be fair and reasonably representative of the community, which is all that is constitutionally required.

*Id.*

*Haworth* did not involve a challenge based on the representation of Blacks in Qualified Juror Wheels. As demonstrated by the chart, *supra,* the absolute disparity figures for Blacks in the Albuquerque/Santa Fe Division were quite low—.28% in 1993 and .66% in 1995. The comparative disparity numbers of 15.14% for 1993 and 35.68% for 1995 are much greater. However, these disparities do not reach the threshold for finding a violation of the Sixth Amendment. Both the comparative and the absolute disparities are well within what the Tenth Circuit in *Yazzie* has specified is acceptable.[12]

### B. Equal Protection Clause of the Fifth Amendment

As a preliminary matter, I question whether Mr. Hughes, a Black individual, has standing to assert a claim that Hispanics and American Indians are underrepresented in violation of the Fifth Amendment's equal protection clause. *See Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977) (noting that, in the context of a Fifth Amendment challenge, defendant must demonstrate substantial underrepresentation of his own group). However, the government has not challenged Mr. Hughes' right to make these assertions. For the purpose of deciding Mr. Hughes' motion, I will assume that he does have standing to contend that Hispanics and American Indians, as well as Blacks, have been underrepresented.

The first step in making a prima facie case of an equal protection violation "is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied." *Castaneda v. Partida,* 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Second, "the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time." *Id.* Finally, to prove an equal protection violation, the defendant must show that the process being used to select the jurors is "susceptible of abuse or is not racially neutral." *Id.* Once a defendant has met these three requirements, the defendant has established a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case. *Id.*

Mr. Hughes clearly has satisfied the first prong of the test. Hispanics, American Indians and Blacks are distinct groups for the purposes of Fifth and Sixth Amendment challenges.

The second requirement, that the underrepresentation[13] be shown to have occurred

---

12. I have some concern about relying on the comparative disparity numbers in this case because of the enormous difference that can be affected in them by a slight change in the absolute number of Blacks in a particular Qualified Juror Wheel. Because Blacks represent such a small proportion of New Mexico's population, a minor fluctuation in the random selection of Black jurors can have a tremendous impact on comparative disparity numbers, as illustrated by the 1993 and 1995 percentages. In 1993 the number of Blacks within the Qualified Juror Wheel was 15 out of a total of 957, whereas in 1995 there were 13 out of a total of 1093. The fact that the 1995 Qualified Juror Wheel included two fewer Black individuals caused the comparative disparity number to almost double. Mr. Hughes has not shown that the two fewer Blacks

in the 1995 Qualified Juror Wheel resulted from anything other than random chance. *See Test,* 550 F.2d at 590 (holding, "We cannot say in the present cases that disparities of less than one person in the demographic composition of petit and grand juries are 'substantial' or that a difference of two persons on a jury panel of fifty persons is a 'gross' or 'marked' disparity."). The absolute disparity figures which are under 1% do not rise to the level of a constitutional violation.

13. To establish a prima facie case for both equal protection and fair-cross-section challenges, Mr. Hughes must demonstrate a substantial underrepresentation of Hispanics, American Indians and Blacks in jury venires. *Yazzie,* 660 F.2d at 426.

over "a significant period of time," has not been met in this case. First, as noted earlier, Mr. Hughes has failed to prove that there is a "substantial underrepresentation" of Hispanics, American Indians and Blacks in the Qualified Juror Wheels.

Even if Mr. Hughes had established that Hispanics, American Indians and/or Blacks have been underrepresented, he has failed to show that this occurred over "a significant period of time." Mr. Hughes argues that *Yazzie* and "the history of discrimination" in New Mexico demonstrate that the degree of underrepresentation is not a random occurrence. However, Mr. Hughes has provided statistics relating to Hispanics and Blacks only for the years 1993 and 1995. Moreover, Mr. Hughes' "history of discrimination" argument pertains only to American Indians and Hispanics, but not to Blacks. Mr. Hughes presented no examples from New Mexico's history of discrimination against Blacks. Because Mr. Hughes has not furnished concrete statistics for Hispanics or Blacks over a "significant period of time," [14] I cannot conclude that the disparities as to Hispanics or Blacks are anything other than the random result of an otherwise constitutionally acceptable process for the selection of jurors.

In regard to American Indians, Mr. Hughes relies upon the statistics presented in *United States v. Yazzie.* In *Yazzie,* as noted earlier, the Tenth Circuit approved a 4.29% absolute disparity for American Indian representation in the Albuquerque/Santa Fe Division Qualified Juror Wheel used to select Yazzie's petit jury, and a 2.94% absolute disparity for the statewide Qualified Juror Wheel used to select the grand jury that indicted Mr. Yazzie. The Tenth Circuit also found the comparative disparities of 45.2% (relating to the grand jury) and 46.3% (relating to Yazzie's petit jury) to be constitutionally acceptable. It appears that the representation of American Indians in Qualified Juror Wheels has changed markedly since the time *Yazzie* was decided. As the chart above indicates, in 1993 the absolute disparity for American Indians was 3.26% and the comparative disparity was 32.44%. In 1995, the absolute disparity was 3.19% and the

comparative disparity was 31.74%. A comparison of the *Yazzie* statistics with those presented at the November *Gonzales* hearing reflects that the absolute disparity has decreased over 1% and the comparative disparity has decreased almost 15% from 1977 through 1995. The Tenth Circuit concluded in *Yazzie* that the 2.94%–4.29% absolute disparity figures and the 45.2%–46.3% comparative disparity figures for American Indians did not violate the Fifth or Sixth Amendments. It would seem, therefore, that the considerably lower figures for 1993 and 1995 also would conform to constitutional requirements.

Mr. Hughes has also failed to satisfy the third prong of the *Castaneda* equal protection test because he has not proven that the jury selection process utilized in the District is susceptible of abuse or is not racially neutral. Section 1863(b)(2) of the Jury Selection and Service Act directs the district courts to use voter registration lists or lists of actual voters as the initial source of names from which to draw juror wheels. 28 U.S.C. § 1863(b)(2). Courts are to "prescribe some other source or sources of names in addition to voter lists where necessary to foster the policy and protect the rights secured by sections 1861 and 1862." *Id.* The legislative history of the Act further clarifies Congress' intent: " 'The voting list need not perfectly mirror the percentage structure of the community. But any substantial deviations must be corrected by the use of supplemental sources.' " *U.S. v. Test,* 550 F.2d at 584 (quoting S.Rep. No. 891, 90th Cong., 1st Sess. at 17 (1967)). The implicit assumption underlying Congress' direction to use voter registration lists as the initial source in juror wheel composition appears to be that they are facially neutral with respect to race, unless "substantial deviations" are proven to exist. "The supplementation of voter lists is the exception, not the rule, and absent a showing of deficient representation the use of an approved jury selection process is lawful." *United States v. Bennett,* 539 F.2d 45, 55 (10th Cir.1976) (citations omitted), *cert. denied,* 429 U.S. 925, 97 S.Ct. 327, 50 L.Ed.2d 293 (1976).

**14.** I do not consider two years to constitute a "significant period of time."

Mr. Hughes has failed to show a "deficient representation" resulting from the District's juror selection plan. The use of voter registration lists provides little opportunity for subjective or racially motivated judgments. This is in contrast to other systems which have been struck down because they permitted subjectivity and opportunities for discrimination. *See Alexander v. Louisiana,* 405 U.S. 625, 630, 92 S.Ct. 1221, 1225, 31 L.Ed.2d 536 (1972) (finding discrimination when jury commissioners had "a clear and easy opportunity for racial discrimination"); *and Smith v. Yeager,* 465 F.2d 272, 280 (3d Cir.1972) (court struck down system that permitted "tainted subjective decisions").

Mr. Hughes also argues that there may be cost-effective, practical alternatives to the District's current system for selecting jurors. However, Mr. Hughes' contention does not prove that the current facially neutral system violates his Fifth Amendment or Sixth Amendment rights.

IT IS THEREFORE ORDERED that defendant's "Motion to Select Jurors from a Constitutionally Representative Venire" (Doc. No. 66 ) is DENIED.

# ATTACHMENT

Printed in USA   Trans-Optic™ by NCS MP98   654   A0004

## from UNITED STATES DISTRICT COURT

ROBERT M. MARCH, CLERK
U.S. DISTRICT COURT
P.O. BOX 689
ALBUQUERQUE, NM 87103

**TO:** IS YOUR NAME AND PERMANENT ADDRESS CORRECT?  YES ○  NO ○
IF "NO", PROVIDE CORRECTIONS ON REVERSE SIDE

**IMPORTANT DIRECTIONS FOR MARKING ANSWERS & SIGNING THIS FORM — USE A NO. 2 PENCIL**
- DO NOT USE INK OR BALLPOINT
- FILL OUT FORM ON HARD SURFACE
- MAKE HEAVY BLACK MARKS THAT FILL THE CIRCLE COMPLETELY
- ERASE ANY CHANGES COMPLETELY
- MAKE NO STRAY MARKS
- DO NOT WRITE IN MARGINS NOR IN OFFICIAL USE ONLY AREAS

RIGHT ①②③●
WRONG ①⊗③④

**FOR OFFICIAL USE** — JURORS PLEASE DO NOT WRITE IN THIS SPACE
QUAL ○  DIS ○  XCUS ○
XMPT ○  XCL ○  OTH ○
DEC ○  UND ○
○ ○
COURT I.D.
JUROR I.D.

PLEASE SHOW YOUR PHONE NUMBER — HOME / WORK (INCL. EXTENSION)
COUNTY YOU NOW LIVE IN
AREA CODE   NUMBER   AREA CODE   NUMBER & EXT

## JUROR QUALIFICATION QUESTIONNAIRE — PLEASE READ LETTER ON OTHER SIDE BEFORE COMPLETING.

### SECTION A
USING A NO. 2 PENCIL, FILL IN COMPLETELY YOUR RESPONSE TO EACH QUESTION    YES  NO

1 ARE YOU A CITIZEN OF THE UNITED STATES?  ○ ○

2 ARE YOU 18 YEARS OF AGE OR OLDER? GIVE YOUR AGE  ○ ○

3 HAVE YOU LIVED FOR THE PAST FULL YEAR — IF "NO" SHOW UNDER REMARKS ON REVERSE THE NAMES OF OTHER COUNTIES OR STATES IN WHICH YOU LIVED DURING THE YEAR AND SHOW DATES   IN THIS STATE ○ ○   IN THE SAME COUNTY? ○ ○

4 DO YOU READ, WRITE, SPEAK AND UNDERSTAND THE ENGLISH LANGUAGE?  ○ ○

IF YOUR ANSWER TO NO. 5, 6 OR 7 IS "YES" PLEASE GIVE MORE INFORMATION ON REVERSE SIDE

5 ARE ANY CHARGES NOW PENDING AGAINST YOU FOR A VIOLATION OF STATE OR FEDERAL LAW PUNISHABLE BY IMPRISONMENT FOR MORE THAN ONE YEAR?  ○ ○

6 HAVE YOU EVER BEEN CONVICTED, EITHER BY YOUR GUILTY OR NOLO CONTENDERE PLEA OR BY A COURT OR JURY TRIAL, OF A STATE OR FEDERAL CRIME FOR WHICH PUNISHMENT COULD HAVE BEEN MORE THAN ONE YEAR IN PRISON?  ○ ○

7. (IF "YES"), WERE YOUR CIVIL RIGHTS RESTORED? (IF "YES", EXPLAIN ON REVERSE SIDE)  ○ ○

8 DO YOU HAVE ANY PHYSICAL OR MENTAL DISABILITY THAT WOULD INTERFERE WITH OR PREVENT YOU FROM SERVING AS A JUROR? (IF "YES", EXPLAIN UNDER REMARKS ON REVERSE)  ○ ○

9. EXEMPTIONS — ARE YOU EMPLOYED ON A FULL TIME BASIS AS A

PUBLIC OFFICIAL OF THE UNITED STATES, STATE, OR LOCAL GOVERNMENT WHO IS ELECTED TO PUBLIC OFFICE OR DIRECTLY APPOINTED BY ONE ELECTED TO OFFICE  ○ ○

MEMBER OF ANY GOVERNMENTAL POLICE OR REGULAR FIRE DEPT. (NOT INCLUDING VOLUNTEER OR NON-GOVERNMENTAL DEPARTMENTS)  ○ ○

MEMBER IN ACTIVE SERVICE OF THE ARMED FORCES OF THE UNITED STATES.  ○ ○

10 GROUND FOR EXCUSE
SECTION B AT THE RIGHT DESCRIBES CERTAIN CATEGORIES OF PERSONS WHO MAY BE EXCUSED FROM SERVICE AS A JUROR. IF YOU ARE A PERSON IN ONE OF THESE CATEGORIES AND YOU WISH TO BE EXCUSED, FILL IN COMPLETELY THE CIRCLE FOR THE NUMBER OF YOUR CATEGORY HERE ➡
OR IF YOU WISH TO SERVE, DO NOT SHOW ANYTHING HERE. PERSONS SHOWING A CATEGORY OF EXCUSE WHICH REQUIRES MORE INFORMATION MUST GIVE IT ON THE OTHER SIDE UNDER "REMARKS"
1 ○  6 ○
2 ○  7 ○
3 ○  8 ○
4 ○  9 ○
5 ○

### RACE
FILL IN THE CIRCLE COMPLETELY WHICH BEST DESCRIBES YOUR RACE. SEE NOTE ON REVERSE SIDE) TO ASSIST IN ENSURING THAT ALL PEOPLE ARE REPRESENTED ON JURIES. PLEASE INDICATE WHICH OF THE FOLLOWING APPLIES TO YOU NOTHING DISCLOSED WILL AFFECT YOUR SELECTION FOR JURY SERVICE.

12 SEX   A) ○ BLACK   ○ ASIAN   ○ OTHER
MALE ○   ○ WHITE   ○ AMERICAN INDIAN
FEMALE ○   B) ARE YOU HISPANIC?  ○ YES   ○ NO

13 OCCUPATION (See reverse side)
ARE YOU NOW EMPLOYED?   YOUR USUAL OCCUPATION, TRADE OR BUSINESS
○ NO  ○ YES
YOUR EMPLOYER'S NAME
BUSINESS OR EMPLOYER'S ADDRESS

14 EDUCATION
SHOW THE EXTENT OF YOUR EDUCATION BY GIVING NO. OF YEARS ABOVE GRADE SCHOOL
___ High School
___ Above High School
___ Trade/Vocational School

### SECTION B
GROUNDS FOR REQUESTING EXCUSE
(Category number)
Are you
1) Over 70 years of age (if so, give month, day & year of birth under Remarks")
2) A person who has served as a grand or petit juror in federal court within the last 2 years (give name of court and dates you served under "Remarks" section)
3) A person who serves without compensation as a volunteer firefighter or member of a rescue squad or ambulance crew for a federal, state (including the District of Columbia and territories of the United States), or local government agency (describe your service and identify the agency for which you work under "Remarks.")

15 I declare under penalty of perjury that all answers are true to the best of my knowledge and belief
○ Single  ○ Married  ○ Widowed  ○ Separated or Divorced

If another person filled out the above form, please indicate that person's name, address and reason why on other side of form

**SIGN HERE** ➡ _____   DATE _____

○ Mr  ○ Mrs  ○ Miss  ○ Ms   SOCIAL SECURITY NUMBER ___-__-____

IF YOUR ADDRESS CHANGES AFTER YOU HAVE RETURNED THE QUESTIONNAIRE PLEASE NOTIFY THE COURT PROMPTLY BY LETTER OR POST CARD ADDRESSING IT TO ATTENTION JURY CLERK

## ATTACHMENT

DEAR JUROR

IN ORDER TO ASSIST THE COURT AND TRIAL LAWYERS IN PRELIMINARY QUESTIONING OF JURORS FOR SPECIFIC TRIALS AND ALSO TO PROVIDE INFORMATION ABOUT YOU, WOULD YOU PLEASE TYPE OR PRINT ANSWERS ON THIS FORM, OR INDICATE BY CHECK MARKS WHERE APPLICABLE AND RETURN IT TO THE JURY CLERK.

IF NOT ENOUGH SPACE IS AVAILABLE FOR YOUR ANSWER, USE THE REVERSE SIDE. WRITE THE QUESTION NUMBER BESIDE YOUR ANSWER.

1 NAME  LAST  MIDDLE INITIAL  FIRST

ADDRESS  STREET

CITY  STATE  ZIP  COUNTY

2 HOME TELEPHONE  BUSINESS TELEPHONE

3 HOW LONG HAVE YOU RESIDED  YEARS  WITH REGARD TO YOUR RESIDENCE INDICATE
AT ABOVE ADDRESS?  WHETHER YOU OWN ☐  RENT ☐

5 HOW LONG HAVE YOU RESIDED IN THE STATE OF NEW MEXICO?  YEARS

6 IN WHICH STATE HAVE YOU RESIDED THE LONGEST PERIOD OF TIME?

7 ARE YOU A CITIZEN OF THE UNITED STATES?  YES ☐  NO ☐
IF NATURALIZED  WHERE
STATE WHEN

8 DATE OF BIRTH  PLACE OF BIRTH

9 AGE  SEX  MALE ☐  FEMALE ☐
MARITAL STATUS  SINGLE ☐  MARRIED ☐  WIDOWED ☐  SEPARATED ☐  DIVORCED ☐

10 OCCUPATION OR BUSINESS

11 IF RETIRED YOUR OCCUPATION BEFORE RETIREMENT

12 NAME AND ADDRESS OF EMPLOYER

SPECIFIC DUTIES OR PRINCIPAL ACTIVITY

13 SPOUSE'S OCCUPATION

14 CAN YOU READ AND WRITE
SPEAK AND UNDERSTAND THE ENGLISH LANGUAGE?  YES ☐  NO ☐

15 EDUCATION  ELEMENTARY____ YRS  SECONDARY____ YRS  COLLEGE____ YRS
VOCATIONAL SCHOOL____ YRS  COLLEGE OR PROFESSIONAL SCHOOL____ YRS

16 HAVE YOU EVER SERVED AS A JURY?  IF SO, WHERE?  WHAT COURT?  TYPE OF CASE  CRIMINAL ☐  CIVIL ☐
YES ☐  NO ☐

17 WERE YOU EVER CONVICTED OF A STATE OR FEDERAL CRIME PUNISHABLE
BY IMPRISONMENT FOR MORE THAN ONE YEAR?  YES ☐  NO ☐

18 IF ANSWER TO 17 IS "YES", WERE YOUR CIVIL RIGHTS RESTORED BY PARDON?  YES ☐  NO ☐

19 ARE ANY CHARGES PENDING AGAINST YOU?  YES ☐  NO ☐

20 HAVE YOU EVER BEEN REPRESENTED BY AN ATTORNEY AT LAW?  YES ☐  NO ☐
IF SO, BY WHAT ATTORNEY OR LAW FIRM?

21 ARE YOU (OR IS ANY MEMBER OF YOUR FAMILY) AT PRESENT
(OR IN THE PAST HAVE YOU OR HAS ANY MEMBER OF YOUR FAMILY BEEN)
AN AGENT, EMPLOYEE OR REPRESENTATIVE OF AN INSURANCE COMPANY?  YES ☐  NO ☐
IF SO, WHAT COMPANY

22 HAVE YOU EVER BEEN A PARTY TO A LAWSUIT?  YES ☐  NO ☐  IF SO, WERE YOU  PLAINTIFF ☐  DEFENDANT ☐
NATURE OF SUIT GENERALLY  WHERE WAS THE LAWSUIT?

23 ARE YOU PRESENTLY, OR HAVE YOU IN THE PAST, BEEN A MEMBER OR EMPLOYEE OF ANY LAW ENFORCEMENT AGENCY?  YES ☐  NO ☐
IF SO GIVE PARTICULARS

24 IS ANY MEMBER OF YOUR FAMILY AT PRESENT
OR HAS ANY MEMBER OR EMPLOYEE OF YOUR FAMILY IN THE
PAST BEEN A MEMBER OR EMPLOYEE OF ANY LAW ENFORCEMENT AGENCY?  YES ☐  NO ☐
IF SO GIVE PARTICULARS

25 OF WHAT FRATERNAL, CIVIC, LABOR OR
OTHER ORGANIZATIONS ARE YOU A MEMBER?

26 DO YOU HAVE ANY PHYSICAL OR MENTAL INFIRMITY
WHICH WOULD IMPAIR YOUR CAPACITY TO SERVE
AS A JUROR?  YES ☐  NO ☐
DO YOU HAVE A HEARING IMPAIRMENT?  YES ☐  NO ☐
IF ANSWER TO EITHER OF THESE IS "YES", CHECK HERE ☐ AND WRITE EXPLANATION ON OTHER SIDE

27 ARE THERE ANY ADDITIONAL MATTERS TOUCHING UPON YOUR
ABILITY TO SERVE AS A JUROR WHICH SHOULD BE BROUGHT TO THE
ATTENTION OF THE COURT? IF SO, CHECK HERE ☐ AND WRITE EXPLANATION ON OTHER SIDE

SIGNATURE  DATE