

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. WR-89,781-02

### EX PARTE WAYMON JAESHELL STEPHERSON, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 77949-CR-B IN THE 300TH DISTRICT COURT
### FROM BRAZORIA COUNTY

WALKER, J., delivered the opinion of the Court, in which KELLER, P.J., and HERVEY, RICHARDSON, NEWELL, KEEL, SLAUGHTER, and MCCLURE, JJ., joined. YEARY, J., concurred in the result.

## O P I N I O N

The former District Clerk of Brazoria County, Rhonda Barchak, devised a process of creating jury panels.[1] Instead of randomly selecting from the general venire, she systematically sorted the

---

[1] Throughout this opinion, we will refer to the prospective jurors that are assigned to a court for trial, examined in voir dire, and subjected to strikes for cause and peremptory strikes, as the "jury panel." *See, e.g.*, *Wells v. State*, 611 S.W.3d 396, 428–30 (Tex. Crim. App. 2020). This group is also commonly referred to as the "venire." *See Venire*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A panel of persons selected for jury duty and from among whom the jurors are to be chosen. — Also termed array; jury panel; jury pool; (redundantly) venire panel.").

We will refer to the initial group of prospective jurors that receives summonses and shows up for jury duty, from which the jury panel is formed, as the "general venire." *See, e.g.*, *Chambers*

general venire based upon whether the potential juror was white or non-white and whether that potential juror lived in Pearland or outside of Pearland. From that sorted general venire, she evenly distributed those prospective jurors to jury panels.

Using Barchak's sorting process, a jury was empaneled for Applicant Waymon Jaeshell Stepherson's trial. The Brazoria County jury convicted him. Applicant, who is black or African American, claims in this application for a writ of habeas corpus that a race-based process was used to create the jury panel for his trial, implicating constitutional concerns of due process, equal protection, and the right to trial by an impartial jury. Applicant also claims a violation of the statutory requirement of a randomly selected jury panel.

Based upon the record before us, we find that Barchak's process was indeed race-based, but her process was not designed to exclude certain groups or cause those groups to be underrepresented. The process was designed to be *inclusive* and sought to *avoid* underrepresentation by creating jury panels mirroring the proportions of the general venire. It therefore seems that the constitutional guarantees of due process, equal protection, and trial by an impartial jury were not violated. Habeas corpus relief is denied.

---

*v. State*, 903 S.W.2d 21, 29 (Tex. Crim. App. 1995); *Davis v. State*, 782 S.W.2d 211, 212 (Tex. Crim. App. 1989). In other cases, we have referred to this group as the "general jury pool or general assembly." *See, e.g.*, *Jasper v. State*, 61 S.W.3d 413, 423 (Tex. Crim. App. 2001); *Wells*, 611 S.W.3d at 428 (quoting *Jasper*); *see also* George E. Dix & John M. Schmolesky, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 41:5, at 623 (3d ed. 2023) ("the general jury panel").

Finally, the jurors who are selected from the jury panel to sit on the trial itself will be referred to simply as the "jury." This group is also referred to as the "petit jury." *Jury, - petit jury*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A jury (usu. consisting of 6 or 12 persons) summoned and empaneled in the trial of a specific case. — Also termed petty jury; trial jury; common jury; traverse jury.").

## I — Juror Cards Were Sorted by Race

In July of 2010, after the death of then-District Clerk Jerry Deere, Barchak was appointed to serve the remainder of Deere's unexpired term. Barchak was elected to her first full term as district clerk in November 2010, and she was re-elected in 2014 and 2018.

In 2015, the Legislature abolished the "key man" grand jury system and adopted a selection system similar to that for petit juries.[2] The new grand jury selection system provided that "[t]he grand jurors and the alternate grand jurors must be randomly selected from a fair cross section of the population of the area served by the court."[3] Barchak observed the judges' assembly of the grand juries in this fashion, and she created a petit jury selection system which she believed reflected this process.

Previously, when prospective jurors arrived for jury duty, they would fill out juror questionnaire cards. A bailiff would collect the cards from the jurors, and a clerk would gather the cards from the bailiff. The cards would be shuffled, counted out, and divided to make each jury panel requested by the judges. Deputy Clerk Rhonda Hammonds would then scan each panel's cards into

---

[2] "As amended, the grand jury commissioners system of organizing a grand jury known as the Key Man or Pick a Pal method is abolished, leaving only the random selection method in law." S. Comm. on Crim. Just., Bill Analysis, Tex. H.B. 2150, 84th Leg., R.S.; *see also* Kristin Etter et al., *Criminal Law*, 78 TEX. B.J. 647, 648 (2015) ("HB 2150 abolishes the current grand jury 'key-man' or 'pick-a-pal' method, wherein a judge selects three commissioners to be in charge of choosing persons to serve on a grand jury. Instead, HB 2150 utilizes the random selection method for grand jurors like that already in use to pick petit jurors.").

[3] Act of May 31, 2015, 84th Leg., R.S., ch. 929, § 8, 2015 Tex. Gen. Laws 3202, 3204 (adding TEX. CODE CRIM. PROC. Ann. art. 19.26(a)).

In a "nonsubstantive revision of certain provisions of the Code of Criminal Procedure," Chapter 19 was repealed in 2019 and replaced by Chapter 19A. Act of May 21, 2019, 86th Leg., R.S., ch. 469, §§ 1.03, 3.01(2), 2019 Tex. Gen. Laws 1065, 1070, 1151. What was then article 19.26(a) is now article 19A.201(a). *See* TEX. CODE CRIM. PROC. Ann. art. 19A.201(a).

the TSG computer system and print three copies of the jury list for each panel for the judge and the clerks in the courtroom.

Barchak's new system of creating jury panels, which was used for all of Brazoria County's trials, civil and criminal, worked as follows:

1.    When members of the general venire were assembled and their juror questionnaire cards were taken up, Barchak or her designee would take those cards into the jury room.

2.    There, the cards would be separated into five piles: (1) white jurors living in the city of Pearland; (2) non-white jurors living in Pearland; (3) white jurors living outside of Pearland; (4) non-white jurors living outside of Pearland; and (5) cards that were not properly filled out.

3.    After creating the five piles (or decks) of cards, Barchak or her designee would take one of the four race-residence decks—usually white-Pearland, which would be the largest—and deal one card to ten to fifteen new piles.

4.    After dealing a card to each of the new piles, Barchak or her designee would then put that initial race-residence deck back, and pick one of the other three race-residence decks, from which a card would be dealt onto each of the previously dealt cards.

5.    They would continue dealing cards from the remaining two race-residence decks, and then return to the first deck, repeating the process until all the cards from the original four race-residence decks were distributed among the ten to fifteen piles.

6.    Once all the race-residence decks were exhausted and the piles were created, they would then stack the piles together to create a single deck, reconstituting most of the deck of general venire cards, without the incorrectly filled out cards.

7.    Barchak or her designee would then lay out the day's "judge's cards," which indicated how many venire persons each judge requested.

8.    Based on the number requested on each judge's card, they would first distribute the improperly filled out juror cards to the judges' cards.

9.    Then, from the top of the reconstituted deck of general venire cards, cards

would be dealt to the judge's stack until the requested number was met.

10. They would then fill the next judge's stack and so on, until all of the judges' stacks were filled.

11. Afterwards, the judge's card, which would be at the bottom of each stack, would be moved from the bottom to the top of its respective stack.

12. The judge's stack would be passed to Hammonds.

13. Hammonds would scan the judge's stack into the Tyler Technologies computer system and use the Tyler system to print a copy of the jury list, but the cards would come out in a random order instead of the order that they were scanned in.[4]

14. Hammonds would sort the cards in alphabetical order,[5] and she would give copies of the jury lists to the trial judge, the prosecution, and the defense.

It is unclear when Barchak's office began employing this procedure, but it was in use by September 1, 2015, when the "key man" system was abolished. She did not talk to any of the judges about her procedure, and she was unaware that the Brazoria County Commissioner's Court had adopted jury selection plans in 1993 and in 2018, the 2018 version of which provided for random selection of jury panels.[6] Outside of the district clerk's office, Barchak's plan was unknown to parties

---

[4] This was unlike the previous system which Hammonds found to be "a lot easier" because the older system returned the cards in the same order that they were scanned in.

[5] Although Hammonds did not explain why the TSG system made things easier for her, when viewed in the context of her explanation that she would have to alphabetically sort the cards after the Tyler system randomly returned them, it appears that Hammonds alphabetically-ordered the juror cards before scanning. The TSG system's first-in-first-out scanning would be easier since she would only have to alphabetize the juror cards once, whereas with the Tyler system she would alphabetize them twice.

[6] The Brazoria County Commissioner's Court's 2018 jury selection plan contained a provision relating to "Specific Panels":

Pursuant to Chapter 62.015 of the Government Code, the judge or the District Clerk as directed by the judge, shall randomly select panels of prospective jurors and order

involved in litigation in Brazoria County, including the judges, the district attorney's office, defense counsel, and defendants.

Meanwhile, Applicant was charged with two counts of aggravated robbery, and voir dire was first conducted on October 10, 2016. One of the jurors was involved in a car accident and was unable to continue, and Applicant declined to continue with eleven jurors. The trial court granted his motion for a mistrial. On November 14, 2016, voir dire was conducted a second time. The second jury found Applicant guilty and sentenced him to thirty-eight years' imprisonment on each count. Applicant did not object to the composition of either the October 10 panel or the November 14 panel, nor did he ask for a jury shuffle or assert that he was ever forced to take an objectionable juror.

Applicant appealed the conviction, arguing that the trial court should have granted a motion to suppress a photo array, that he received ineffective assistance of counsel, and that the punishment charge erroneously included enhancements, but the court of appeals upheld the conviction. *Stepherson v. State*, No. 01-16-00936-CR, 2018 WL 761644, at *1 (Tex. App.—Houston [1st Dist.] Feb. 8, 2018, pet. ref'd) (mem. op., not designated for publication). After issuance of the mandate, Applicant filed his first application for writ of habeas corpus, in which he raised an evidentiary claim, a *Brady* claim, an ineffective assistance of counsel claim, an impartial jury claim,[7] and an

---

those panels of prospective jurors to appear at a specific date, time and place for each respective panel. The judges will inform the District Clerk how many prospective jurors to place on each panel.

The record does not describe any provisions related to jury panel formation in the 1993 plan.

[7] The impartial jury claim raised in the first application did not allege jury bias due to the racial makeup of the panel or that such makeup was caused by Barchak's process, which was at that time still unknown. Applicant's claim argued that the jury had become tainted during voir dire when members of the panel gave their opinions about the presumption of innocence and a defendant's right not to testify.

actual innocence claim. We denied relief on May 15, 2019, and we later denied Applicant's suggestion that we reconsider his application on our own motion.

Two years later, in May 2021, Barchak announced her intention to retire. At this time, jury selection had temporarily moved from the courthouse to a gymnasium to accommodate COVID-19 precautions. At the gymnasium, then-bailiff Tracy Read observed Barchak and Chief Deputy Clerk Cayla Myers sorting the juror cards. Concerned that the sorting of the cards was improper,[8] Read later spoke to an employee of the district clerk's office, who explained that the cards were separated by race and by where the prospective juror lived.

Read told, among others, District Court Judge Justin Gilbert, who in turn informed District Court Judge Patrick Sebesta. Judge Sebesta met with Barchak, and she explained her process to him. Barchak told Judge Sebesta that she used this process to make the panels more diverse, "like the judges do when they are assembling the grand jury." After Judge Sebesta informed Barchak that she could not do that, she said she would stop. Judge Sebesta followed up with Barchak a couple of days later, and she told him that she had been using her method during her entire time as the district clerk.

Judge Sebesta informed the district attorney's office, which in turn contacted the Texas Rangers Public Integrity Unit. Ranger Thomas Norsworthy began his investigation in August 2021, and over the next several months he collected evidence and interviewed Barchak and her staff, judges, attorneys, and bailiff Read, ultimately culminating in a 177-page report. Instead of retiring as planned, Barchak resigned her position after the investigation began. The grand jury declined to indict her of a criminal offense.

---

[8] Read had previously noticed the sorting activity at the courthouse before the pandemic, but apparently that earlier instance did not cause him concern.

After Barchak's system was discovered, Applicant filed the instant subsequent application for writ of habeas corpus, alleging, among other things, that newly-discovered evidence showed a race-based selection system was used to create the jury panel in his case. Because Applicant's claims raised serious constitutional concerns, we remanded the matter to the habeas court to address four questions:

(1) whether the former Brazoria County District Clerk, Rhonda Barchak, utilized a race-based jury selection system to create jury panels;

(2) whether Barchak's selection system had an impact on the racial composition of the jury panels in Brazoria county, including whether certain races or groups were excluded or under-represented;

(3) whether Applicant's specific jury panel represented a fair cross section of his community; and

(4) whether Barchak's error, if any, is considered structural or non-structural error.

On remand, the habeas court admitted into the record Ranger Norsworthy's investigative report, 2010 census data for Texas counties including Brazoria County, and documentation of both of Applicant's juries, including the final jury lists, the parties' strikes, and the individual juror cards. The habeas court concluded that although race was used as an initial factor in creating the jury panels, the record did not show that Barchak's procedure resulted in the systematic exclusion of a distinctive group. Similarly, the habeas court concluded that the record did not show Barchak's system had an impact on the racial composition of the jury panels or caused the exclusion or underrepresentation of any specific races or groups. The habeas court concluded that Applicant's specific jury panels represented a fair cross section of the community, and the court concluded that any error was non-structural. The habeas court recommended that we deny relief.

In order for this Court to determine whether to adopt the habeas court's recommendation, or whether Applicant has shown entitlement to habeas corpus relief, we filed and set the case to address the question of:

> What does a litigant need to show in order to obtain relief on a due process violation claim that a Texas county's method of assembling a jury panel involves racial discrimination.

## II — Racial Discrimination in Jury Procedures Denies Due Process

Although jury discrimination claims are generally brought under the Equal Protection Clause, they are also a matter of due process. The Fourteenth Amendment provides that:

> No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]

U.S. CONST. amend XIV, § 1. In *Peters v. Kiff*, a plurality of the United States Supreme Court declared that defendants indicted and tried by grand or petit juries that "are plainly illegal in their composition" are denied due process of law. *Peters v. Kiff*, 407 U.S. 493, 501 (1972) (plurality op.). The *Peters* plurality explained that:

> a State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well.

*Id.* at 502–03. Furthermore, "the exclusion from jury service of a substantial and identifiable class of citizens has a potential impact that is too subtle and too pervasive to admit of confinement to particular issues or particular cases," and any harm analysis arising under such a system should necessarily be resolved in favor of the criminal defendant. *Id.* at 503–04. As a result, the Court held that:

>whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law.

*Id.* at 504. The Court reversed and remanded to allow Peters to prove the facts he alleged, that Negroes were systematically excluded from grand jury service, although Peters himself was white. *Id.* at 505.[9]

Although *Peters* failed to produce a majority opinion about what legal theory gave Peters standing to raise the claim, whether it was due process, federal statute, or equal protection, the *Peters* opinion was relied upon in the six Justice majority opinion in *Hobby v. United States* to address a claim that discrimination in the selection of grand jury foremen violated the Due Process Clause of the Fifth Amendment. *Hobby v. United States*, 468 U.S. 339, 343–46 (1984). Indeed, the *Hobby* Court began its discussion by stating, in no uncertain terms:

>It is well settled, of course, that purposeful discrimination against Negroes or women in the selection of federal grand jury foremen is forbidden by the Fifth Amendment to the Constitution.

*Id.* at 342. Given that the Fifth Amendment has a Due Process Clause, much like the Fourteenth

---

[9] Whereas the plurality believed that due process was what gave Peters standing to raise the claim, the three-Justice concurrence in *Peters* argued that standing should have been grounded on the "strong statutory policy" behind 18 U.S.C. § 243, which not only prohibits discrimination for federal juries on the basis of race, color, or previous condition of servitude, but makes it a criminal offense (punishable by fine) to so discriminate. *Peters*, 407 U.S. at 506–07 (White, J., concurring). The concurrence would have relied on the statute, not because the statute provided a narrower basis, but instead because the statute had a "broader sweep" and embodied the central concerns of the Fourteenth Amendment. *Id.* (discussing *Hill v. Texas*, 316 U.S. 400, 404, 406 (1942)).

The three-Justice dissent in *Peters* did not dispute that persons could not be excluded from juries on account of race. Rather, the dissent disagreed with the plurality that "such illegality necessarily voids a criminal conviction, absent any demonstration of prejudice, or basis for presuming prejudice, to the accused." *Peters*, 407 U.S. at 507 (Burger, J., dissenting).

Amendment does, but not an Equal Protection Clause of its own,[10] the *Hobby* Court implicitly

affirmed the due process basis for *Peters*. And, if there were still lingering doubts as to whether due

process was the doctrinal basis for *Peters*, eight Justices in *Campbell v. Louisiana* noted that, "Our

decision in *Peters v. Kiff* addressed the due process question," and, "The relevant assumption of

*Hobby* . . . is that a defendant has standing to litigate whether his conviction was procured by means

or procedures which contravene due process." *Campbell v. Louisiana*, 523 U.S. 392, 400–01 (1998).

In the case before us, Applicant does not make an explicit due process argument. However,

his *pro se* writ application in substance invoked a *Peters* due process claim when he alleged that the

Fifth Amendment was violated due to Barchak selecting jurors in an unconstitutional manner. And

although habeas counsel focused almost all of his time at the habeas hearing arguing an equal

protection violation, counsel also argued for structural harm, reasoning that this case is similar to

*Peters* in that it is virtually impossible to show that the selection method caused harm.

What test can we discern from *Peters* to assess Applicant's *Peters*-based due process claim?

The few times that we addressed *Peters*, we had no occasion to articulate a test. This was either

because the challenged system was not arbitrary or discriminatory. *See Aldrich v. State*, 928 S.W.2d

558, 560 (Tex. Crim. App. 1996) (selection system was systematic and neutral). Or there was no

---

[10]   The Fifth Amendment provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, *nor be deprived of life, liberty, or property, without due process of law*; nor shall private property be taken for public use, without just compensation.

U.S. CONST. amend. V (emphasis added).

challenged system at all. *Bird v. State*, 692 S.W.2d 65, 78 (Tex. Crim. App. 1985) (overruling due process *Peters* claim where there was nothing in the record showing that the grand jury was selected on an impermissible basis). Or where the *Peters* claim was not properly before us. *Ex parte Powers*, 487 S.W.2d 101, 103–04 (Tex. Crim. App. 1972) (finding appellant's *Peters* issue not before the Court, where he had waived it). Or, as it was in *Seubert*, where we discussed *Peters* for some other reason. *Seubert v. State*, 787 S.W.2d 68, 69–70 (Tex. Crim. App. 1990) (an argument had been made that *Peters*'s holding on standing allowed defendants to get around the "same race" requirement of *Batson*).[11]

In arguing that due process was not violated by Barchak's procedure, the State points to the Fifth Circuit's opinion in *McGinnis v. Johnson*, in which that court outlined a test for considering a *Peters* claim. *See McGinnis v. Johnson*, 181 F.3d 686, 692 (5th Cir. 1999), *cert. denied*, 528 U.S. 1125 (2000). The only three African Americans in McGinnis's 102 person jury panel were excused by the trial court, and on federal habeas appeal, McGinnis argued that their excusal was unconstitutional for several reasons, including that it violated the Due Process Clause under *Peters*. *Id.* at 689, 692. On the due process claim, the Fifth Circuit court found that *Peters* "allows a criminal defendant to challenge the racial composition of his grand or petit jury under the Due Process Clause,

---

[11] *See also Pierson v. State*, 614 S.W.2d 102, 112 (Tex. Crim. App. 1980) (Teague, J., concurring) (citing *Peters* for notion that "Due Process requires a competent and impartial [jury]." (internal quotations removed)); *Espinoza v. State*, 604 S.W.2d 908, 912 (Tex. Crim. App. [Panel Op.] 1980) (Clinton, J., dissenting) (in arguing that prima facie case of equal protection violation was shown, quoting *Peters*'s discussion on how racial exclusion impacts fair and even-handed administration of justice); *Stanley v. State*, 678 S.W.2d 80, 80–81 (Tex. Crim. App. 1984) (on refusal of petition for discretionary review) (Clinton, J., dissenting) (arguing that petition should be granted because defendant had made prima facie case that equal protection was violated by exclusion of women from grand juries, but conceding cloudiness of whether male defendant had standing to raise the equal protection claim; suggesting the male defendant had standing and could raise the issue as a matter of due process under *Peters*).

only when the arbitrary or systematic exclusion of a particular racial group renders the jury 'plainly illegal in [its] composition.'" *Id.* at 692 (quoting *Peters*, 407 U.S. at 501). The Fifth Circuit panel ruled against McGinnis, because although the three were part of a distinctive group, he did not show that their excusal rendered the jury "plainly illegal" and he failed to show systematic exclusion. *Id.*[12]

We find the Fifth Circuit's formulation of *Peters* in *McGinnis* apt. On the issue that we filed and set Applicant's case for, we hold that, on claims that due process was violated by a county's employment of a racially discriminatory process in constructing its jury panels, an applicant must make two showings to sustain his due process-based challenge: (1) systematic exclusion of a particular group; and (2) that exclusion rendered the jury plainly illegal in its composition.

### III — Barchak's Procedure Did Not Exclude; Did Not Violate Due Process

The State concedes that Barchak utilized a race-based jury system to create jury panels, but the State argues that there has been no showing of a systematic *exclusion* of any distinctive group. Instead, the State's position is that whatever effect Barchak's process had in arranging and rearranging the juror cards, ultimately they were all reunited into one single stack which was then fed into the Tyler Technologies system, which had a random output when creating the panels. To the extent that Barchak's process violated anything, the State suggests that it violated the Government Code, but the State argues that statutory violations are not sufficient to establish a violation of due process.

---

[12] Instead, the record showed that the three were excused for non-discriminatory reasons. The first had scheduled an out-of-town vacation. The second had high blood pressure and vision problems, and she worked to support herself. The third suffered seizures and was on medication. *McGinnis*, 181 F.3d at 689.

While the State misunderstands the effect of Barchak's process,[13] the State is correct that her system was not designed to exclude a particular group. Instead, Barchak's system was designed to evenly distribute whites and non-whites, Pearland residents and non-Pearland residents, throughout the reassembled deck of general venire cards. The end result was a systematic *inclusion* in each jury panel of white Pearland residents, non-white Pearland residents, white residents of the county outside of Pearland, and non-white residents of the county outside of Pearland, in the same proportion as they were in the general venire. Although systematic and not race neutral, Barchak's process did not cause an exclusion of any group of venire persons. The first prong of *McGinnis* is not met, and Applicant does not show Barchak's process violated his right to due process of law.

Insofar as Applicant raised a due process violation, we deny relief.

### IV — Racial Discrimination in Jury Procedures Denies Equal Protection

The Fourteenth Amendment also provides:

No State shall . . . deny to any person within its jurisdiction the equal protection of the laws.

---

[13] As we understand the State's argument, the State sees the end of Barchak's process as handing the entire reorganized deck of general venire cards to Hammonds, who would then feed them into the Tyler Technologies system. Hammonds would then use the Tyler system to output the required number of cards requested by each judge, and the Tyler system would randomly select prospective jurors and give those names to Hammonds, the end result being that Barchak's process would have been for naught.

While inputting all of the general venire cards at once into the Tyler Technologies system, which would then output randomly selected names based on the number requested, seems to be the recommended use, this is not what happened. According to Ranger Norsworthy's report, Barchak and her assistants dealt the required number of juror cards from the reorganized deck of general venire cards to each judge's jury panel. The jury panels were then given to Hammonds to separately scan into the Tyler system, and the Tyler system would output those same names, albeit in a random order. Hammonds would then arrange them in alphabetical order before distributing the lists. As a result, it is the Tyler system's randomization that is for naught.

U.S. CONST. amend. XIV. Equal protection of the laws is denied when a defendant is tried under an indictment issued by a grand jury, or before a petit jury, from which persons have been excluded from those juries solely because of their race. *Hernandez v. Texas*, 347 U.S. 475, 477 (1954). Although a defendant has no right to a "petit jury composed in whole or in part of persons of [the defendant's] own race," he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria. *Powers v. Ohio*, 499 U.S. 400, 404 (1991) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 305 (1879)).

Although courts used to hold otherwise, "a criminal defendant may object to race-based exclusions of jurors . . . whether or not the defendant and the excluded juror share the same races." *Id.* at 402; *Campbell*, 523 U.S. at 398 (applying *Powers* to grand jury context). "The principles that apply to the systematic exclusion of potential jurors on the ground of race are essentially the same for grand juries and for petit juries[.]" *Alexander v. Louisiana*, 405 U.S. 625, 626 n.3 (1972); *see, e.g.*, *Batson v. Kentucky*, 476 U.S. 79, 89 (1986) (in formation of jury, equal protection is violated by race-based use of peremptory strikes); *Avery v. Georgia*, 345 U.S. 559, 562 (1953) (venire); *Alexander*, 405 U.S. at 628 (grand jury); *Castaneda v. Partida*, 430 U.S. 482, 492–93 (1977) (grand jury).

"[I]n order to show that an equal protection violation has occurred in the context of . . . jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of [a] race or . . . identifiable group[.]" *Partida*, 430 U.S. at 494; *Ovalle v. State*, 13 S.W.3d 774, 777 (Tex. Crim. App. 2000) (citing *Partida*). A defendant makes out a prima facie case if he shows:

(1) that a particular group constitutes "a recognizable, distinct class, singled out for

different treatment under the laws, as written or as applied," (2) "the degree of underrepresentation . . . by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time," and (3) "a selection procedure that is susceptible of abuse or is not racially neutral."

*Ovalle*, 13 S.W.3d at 777 (quoting *Partida*, 430 U.S. at 494). Once a prima facie case has been made, the burden shifts to the State to rebut that case. *Id.* That rebuttal must be made by more than a simple protestation that racial considerations played no part in the selection of jurors, nor can the State rely on a presumption that officials discharged their sworn duties. *Partida*, 430 U.S. at 498 n.19.

## V — Barchak's Procedure Did Not Cause Statistical Underrepresentation Over a Significant Period of Time; Did Not Violate Equal Protection

Applicant contends that Barchak's process of dividing juror cards based on the juror's race and residence gives rise to an inference of discriminatory purpose, even if the different stacks were later mixed together to form a jury panel for a particular court to use.[14] According to Applicant, the taint of racial discrimination created by assembling stacks according to race cannot be erased by the subsequent mixing of the separate stacks, and the burden therefore shifts to the State to demonstrate a racially neutral reason for Barchak's jury panel formation.

The State argues that although race was initially a consideration in terms of how she divided these four stacks, there has been no showing by Applicant that certain races or groups were either excluded or underrepresented. Rather, Barchak's system appears to have been intended to achieve

---

[14] Barchak's process actually did not include a step of mixing the cards. To the extent that Applicant's equal protection argument used the word "mixed," we understand he is referring to the fact that the four race-residence decks were ultimately recombined into the reconstituted deck of general venire cards.

the opposite effect—more even distribution of racial minorities in jury panels.[15]

Among other things, the habeas court found that the record does not show that any specific races or groups were excluded or underrepresented, pointing to an audit done during Ranger Norsworthy's investigation. Ranger Norsworthy had collected from the district clerk's office several venire panel juror cards, and Dr. Young, Associate Professor of Educational Leadership at Lamar University, audited twelve jury selection dates for venire panel juror cards from October 19, 2020 through August 2, 2021 (approximately 33% of the total results during that time frame). Apparently, "[t]here were no complete sets of data available to conduct an audit of jury selections prior to 10/2020." Dr. Young found—through the "standard deviation" method—only one statistically significant month, November 2020. During that month, the "other" category was underrepresented by five people while the "white" category was overrepresented by four people. Dr. Young also found that, when all of the data was combined, each racial category was within acceptable or expected ranges.

But Dr. Young's modeling was based on data from October 2020 to August 2021. As the State admits, Barchak's process had fallen into disuse at this time. Ranger Norsworthy's report indicates that this was because of COVID-19; the clerk's office stopped separating cards because fewer jurors were available for venire panels. But even if Barchak was using her system at that time, the data used by Young raises some questions. Young relied on three boxes Ranger Norsworthy collected from deputy clerk Hammonds's office containing jury panels and questionnaires from

---

[15] Although it purported to agree with the State, the habeas court found that the record does not show that Barchak's selection system had an impact on the racial composition of jury panels in Brazoria County. The State's position is not that there was no impact on the racial composition of the venire panels. Rather, its position is that there was an impact—the racial composition was more evenly distributed.

approximately sixty-nine dates. Of all the dates listed, only the date for August 16, 2021 contains a note that, "According to R. Hammonds, this selection was done by Barchak." It is unclear why only this date was singled out that way. Moreover, that specific panel date was not part of Young's audit.

Nevertheless, we agree with the State and the habeas court: Applicant has not proven that equal protection was violated. The crux of Applicant's claim is whether there was "purposeful" discrimination. On the one hand, Barchak's system intentionally sorted the cards by race and location. On the other hand, she claimed that she did this in an attempt to diversify the jury panels, not to exclude any race. The system was "purposeful," although it does not seem to be "discriminatory" in the usual sense of the word.

Accordingly, we have no trouble finding that Applicant has met the third prong of *Partida-Ovalle*; Barchak's system was not racially neutral and was susceptible to abuse. Barchak's system considered race as a factor and used manual sorting by hand by a person, and if the card was unclear about whether the prospective juror was white, that person would have to use their own judgment about whether the juror indicated white or non-white. *Compare Partida*, 430 U.S. at 497 ("the Texas [key man] system of selecting grand jurors is highly subjective. . . . the system is susceptible of abuse as applied."); *and Hernandez v. State*, 24 S.W.3d 846, 850 (Tex. App.—El Paso 2000) (determining "jury wheel" selection system is not susceptible to abuse and is racially neutral).

And if we assume that non-whites constitute a recognizable, distinct class,[16] then Applicant

---

[16] Other courts have declined to consider the catch-all group "non-whites" a distinctive group for the purposes of jury selection claims. *See United States v. Suttiswad*, 696 F.2d 645, 649 (9th Cir. 1982) (rejecting defendant's suggestion to "'add up' all of the separate figures of minority underrepresentation in order to arrive at one figure for underrepresentation of 'non-whites[.]'"); *Gray v. Brady*, 592 F.3d 296, 306 (1st Cir. 2010) (declining to rule that "minorities" would constitute a cognizable group); *United States v. Daly*, 573 F.Supp. 788, 791 (N.D. Tex. 1983) (finding "non-white" not a cognizable, distinct group because "the segment is by its very definition . . . an open-

would meet the first prong of the *Partida-Ovalle* test. Non-whites are singled out for different

treatment because Barchak separated their cards from the cards of white prospective jurors.

Applicant, however, has not met the second prong—i.e., the degree of underrepresentation

over a significant period of time. Aside from census data, he presents no evidence of the makeup of

---

ended category.").

But we take care to note that the groups found within "non-whites" (the census groups other than whites in the census data, i.e., Hispanic or Latino, Black or African American, American Indian and Alaska Native, Asian, Native Hawaiian and Other Pacific Islander) are distinctive on their own.

*See Aldrich v. State*, 928 S.W.2d 558, 560 (Tex. Crim. App. 1996) ("We accept that Hispanics are a distinctive group in any community[.]"); *but see Ovalle*, 13 S.W.3d at 777–78 (assuming, without deciding, that Hispanics are a recognizable, distinct class).

*See Pondexter*, 942 S.W.2d at 580 (African-Americans are a distinctive group).

*See Wamget v. State*, 67 S.W.3d 851, 854 (Tex. Crim. App. 2001) (citing *United States v. Chalan*, 812 F.2d 1302, 1314 (10th Cir. 1987), which recognized striking of American Indians on account of race would violate Equal Protection Clause under *Batson*); *Hirst v. Gertzen*, 676 F.2d 1252, 1256 n.5 (9th Cir. 1982) ("Native Americans constitute a distinct or identifiable group for purposes of making an equal protection challenge to the [jury selection] Plan."); *United States v. Yazzie*, 660 F.2d 422, 426–27 (10th Cir. 1981) ("There is no question that Indians constitute a distinctive group in the community[.]"); *Brower v. State*, 683 P.2d 290, 291–92 (Alaska Ct. App. 1984) (on *Partida* equal protection claim based on alleged exclusion of Alaska Natives, rejecting appellant's claim for failure to show underrepresentation rather than deciding Alaska Natives were not an identifiable group).

*See Kline v. State*, 737 S.W.2d 895, 899 (Tex. App.—Houston [1st Dist.] 1987, pet. ref'd) (finding appellant, "of Oriental extraction," to be a member of a cognizable racial group for equal protection claims under *Batson*); *Williams v. State*, 634 So.2d 1034, 1037–38 (Ala. Crim. App. 1993) (citing *Kline* for proposition that "Asians . . . have been held to be [a] cognizable racial group[.]"); *see also United States v. Shinault*, 147 F.3d 1266, 1271–72 (10th Cir. 1998) (on Sixth Amendment fair cross section claim, considering alleged underrepresentation of Asians after government conceded Asians were a distinctive group); *People v. Luong*, 378 P.3d 843, 848–52 (Colo. App. 2016) (finding trial counsel not ineffective for not objecting to racial makeup of jury panel based on alleged underrepresentation of Asians and Asian-Americans; implicitly accepting those were distinctive groups).

*See Rice v. Cayetano*, 528 U.S. 495, 514–15 (2000) (treating discrimination on the basis of Hawaiian ancestry as a facial race classification because "[a]ncestry [was] a proxy for race").

jury panels during the time Barchak's process was in use. *See, e.g.*, *Carillo v. State*, 566 S.W.2d 902, 918 (Tex. Crim. App. [Panel Op.] 1978) (rejecting *Partida* equal protection claim where "There was no evidence . . . that underrepresentation on the grand jury had occurred over a significant period of time."); *Villa v. Commercial Union Ins. Co.*, 635 S.W.2d 929, 931 (Tex. App.—Amarillo 1982, no writ) (in civil workers compensation case, rejecting *Partida* equal protection claim where plaintiff "introduced no evidence of the proportion of Mexican-Americans summoned to serve as jurors over a significant period of time."). Instead, the record before us shows the opposite: according to Ranger Norsworthy's report, there were "no complete sets of data available to conduct an audit of jury selections prior to 10/2020."

Insofar as Applicant raised an equal protection violation, because Applicant has not presented historical statistical data, we deny relief. However, Applicant does present data from his own trial, and we turn to whether his specific jury panels were rendered unconstitutional by Barchak's system under the Sixth Amendment, rather than the Fourteenth Amendment.

### IV — Racial Discrimination in Jury Procedures Denies An Impartial Jury

The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, *by an impartial jury of the State and district wherein the crime shall have been committed* . . . .

U.S. CONST. amend VI (emphasis added). The Impartial Jury Clause applies to the States by virtue of the Fourteenth Amendment's Due Process Clause. *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968) ("Because we believe that trial by jury in criminal cases is fundamental to the American scheme of justice, we hold that the Fourteenth Amendment guarantees a right of jury trial in all criminal cases which—were they to be tried in a federal court—would come within the Sixth Amendment's

guarantee."); *Bullard v. State*, 548 S.W.2d 13, 19 (Tex. Crim. App. 1977) (citing *Duncan*); *Franklin v. State*, 576 S.W.2d 621, 623 (Tex. Crim. App. 1978) (same).[17]

In considering the Sixth Amendment right to jury trial, the Supreme Court "unambiguously declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 526–27 (1975). "The unmistakable import of [the Supreme Court's] opinions . . . is that the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." *Id.* at 528. Indeed, the fair cross section requirement is fundamental because:

> The purpose of a jury is to guard against the exercise of arbitrary power—to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor and in preference to the professional or perhaps overconditioned or biased response of a judge. . . . This prophylactic vehicle is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial.

*Id.* at 530. But while "petit juries must be drawn from a source fairly representative of the community," there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population." *Id.* at 538. "Defendants are not entitled

---

[17] It has been suggested that "the appropriate vehicle for incorporation may well be the Fourteenth Amendment's Privileges or Immunities Clause, rather than, as [the Supreme] Court has long assumed, the Due Process Clause." *Timbs v. Indiana*, 139 S.Ct. 682, 691 (2019) (Gorsuch, J., concurring); *see also id.* at 691–98 (Thomas, J., concurring) (arguing that the Privileges or Immunities Clause is the proper doctrinal basis for incorporation of the Eighth Amendment); *McDonald v. Chicago*, 561 U.S. 742, 805–58 (2010) (Thomas, J., concurring) (arguing for incorporation of the Second Amendment via the Privileges or Immunities Clause, rather than the Due Process Clause, and documenting evidence that the framers of the Fourteenth Amendment intended the Privileges or Immunities Clause to incorporate the Bill of Rights).

to a jury of any particular composition . . . but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof." *Id.*

> In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979); *Pondexter v. State*, 942 S.W.2d 577, 580–81 (Tex. Crim. App. 1996) (applying *Duren* test).

"A criminal defendant has standing to challenge exclusion resulting in a violation of the fair-cross-section requirement, whether or not he is a member of the excluded class." *Duren*, 439 U.S. at 359 n.1. Once a prima facie case has been made, the burden shifts to the State to show how any disproportionate exclusion manifestly and primarily advances a significant governmental interest. *Id.* at 367–68; *Aldrich*, 928 S.W.2d at 560 (citing *Duren*).

### VII(1) — Distinctive Groups

Although Applicant did not explicitly raise a Sixth Amendment claim, because of the seriousness of his allegations and the supposed lack of demographic data necessary to address the Equal Protection Clause claim, this Court asked for findings on remand on whether Applicant's specific jury panel represented a fair cross section of his community.

The State argues that Applicant's jury panel represented a fair cross section of the community, and habeas counsel concedes as much, at least as it pertains to black people. After looking at the racial composition of Applicant's two panels, the habeas court made a similar

conclusion: Applicant's specific jury panels represented a fair cross section of his community.

As a preliminary matter, we note that the parties seemed to look only at the number of black people on Applicant's jury, presumably because Applicant himself is black. But Sixth Amendment fair cross section claims are not limited to the defendant's racial class. *Duren*, 439 U.S. at 359 n.1. And we know that Barchak's sorting system was not black-and-white; rather, her system was white-and-non-white (and Pearland-and-non-Pearland). Non-whites includes distinctive groups within the community (i.e., Hispanic or Latino, Black or African American, American Indian and Alaska Native, Asian, Native Hawaiian and other Pacific Islander). And whites are themselves a distinctive group within the community. Applicant has met the first *Duren* prong.

**VII(2) — Did Not Systematically Exclude; Did Not Violate Impartial Jury Clause**

We need not decide whether the second *Duren* element is met—i.e., whether the data shows that the representation of non-whites in Applicant's jury panels was not fair and reasonable in relation to the number of non-whites in the community—because he fails to meet the third *Duren* prong—i.e., that there was a systematic exclusion that caused the underrepresentation. Even if Applicant's jury panels were statistically non-representative of Brazoria County, "the Constitution does not require proportionate representation of races on jury panels." *May v. State*, 738 S.W.2d 261, 269 (Tex. Crim. App. 1987). What the Constitution requires is "selection of the panel . . . without discrimination as to race." *Id.* The third *Duren* prong must be proved by more than a showing of underrepresentation; "[d]isproportionate representation in a single panel does not demonstrate the systematic exclusion of distinctive groups in violation of appellant's rights under the Sixth Amendment." *Id.*

As we discussed with regard to the due process claim, Barchak's procedure was undoubtedly

systematic. But just like the due process claim, that system must cause an "exclusion." And as discussed with the due process claim, her system was actually designed to be inclusive, by seeking to ensure that each jury panel matched, as nearly as possible, the proportions of the general venire. Even if we assume that Applicant's jury panels were non-representative of Brazoria County, that would be an indication that the October 10 and November 14 general venires themselves were underrepresentative when compared to the community. There can be several reasons for why a particular general venire may fail to represent the community—a county's list of prospective jurors might not fairly reflect the community; a list could be a fair reflection, but the prospective jurors who were randomly selected for jury duty were not a fair cross section; or the prospective jurors who received summonses could be a fair cross section, but the ones who responded and showed up were not.[18] But nothing of the sort is in the record, and there is no suggestion that Barchak's process had any role to play in which Brazoria County residents received jury summons nor any role to play in which summoned jurors responded and appeared.

Accordingly, regardless of whether Applicant's jury panels were representative of a fair cross section of the community, "[n]o opportunity or method for systematic exclusion is shown." *May*, 738 S.W.2d at 269. The third *Duren* prong is not met. Applicant has failed to show that his right to an impartial jury under the Sixth Amendment was violated.

### VIII — Article 35.11 Was Not Violated

---

[18] *See Spencer v. State*, No. 11-02-00306-CR, 2003 WL 22233540, at *5–6 (Tex. App.—Eastland Sept. 26, 2003, pet. struck) (not designated for publication) (rejecting *Duren* claim where the people receiving jury summons were proportional, but only 7% of those reporting for jury duty were Hispanic although they were 25% of Dallas County; defendant merely showed that a disproportionate number of Hispanics failed to report for jury duty); *Puente v. State*, No. 11-02-00331-CR, 2003 WL 21804906, at *3 (Tex. App.—Eastland Aug. 7, 2003, no pet.) (not designated for publication) (same).

In addition to his claims that Barchak's process violated the constitution, Applicant alleges it violated article 35.11 of the Code of Criminal Procedure, which provides:

> The trial judge, on the demand of the defendant or his attorney, or of the State's counsel, shall cause a sufficient number of jurors from which a jury may be selected to try the case to be randomly selected from the members of the general panel drawn or assigned as jurors in the case. *The clerk shall randomly select the jurors by a computer or other process of random selection* and shall write or print the names, in the order selected, on the jury list from which the jury is to be selected to try the case. The clerk shall deliver a copy of the list to the State's counsel and to the defendant or his attorney.

TEX. CODE CRIM. PROC. Ann. art. 35.11 (emphasis added).

While Applicant is correct that this statute unequivocally places a duty upon the district clerk to randomly select jurors,[19] he misses that this is the "jury shuffle" statute. Its provisions come into play "on demand of the defendant or his attorney, or of the State's counsel," and the jurors to be shuffled are "from the members of the general panel drawn or assigned as jurors in the case" (i.e., the already selected jury panel). Neither of Applicant's jury panels were shuffled, and there is no claim that Applicant or the State demanded a shuffle and that the shuffle was improperly performed through Barchak's process instead of random selection. Strictly as a matter of form, Barchak's process did not violate article 35.11.

In any event, even if article 35.11 was violated, Applicant misses that this is habeas corpus, not direct appeal. Purely statutory violations are not cognizable in habeas corpus. *See Ex parte Johnson*, 541 S.W.3d 827, 829–30 (Tex. Crim. App. 2017) (holding habeas corpus is not an appropriate vehicle for a claim based purely on statute). "[W]e do not sanction noncompliance with

---

[19] TEX. CODE CRIM. PROC. Ann. art. 35.11 ("The clerk shall randomly select the jurors by a computer or other process of random selection."); TEX. GOV'T CODE Ann. § 311.016(2) ("'Shall' imposes a duty.").

procedural rules designed to safeguard constitutional rights." *Ex parte Sadberry*, 864 S.W.2d 541, 543 (Tex. Crim. App. 1993). But violations of such procedural rules and statutes are not a basis for habeas corpus relief, even if they are "mandatory" and designed to protect a defendant's constitutional right to a jury trial. *See Ex parte McCain*, 67 S.W.3d 204, 211 (Tex. Crim. App. 2002) (holding non-cognizable violation of article 1.13(c), the statutory requirement that trial court appoint counsel for an unrepresented defendant before that defendant may waive jury); *Sadberry*, 864 S.W.2d at 543 (holding non-cognizable violation of article 1.13(a), the statutory requirement that jury waiver must be made in person by the defendant in writing); *Ex parte Douthit*, 232 S.W.3d 69, 74 (Tex. Crim. App. 2007) (holding non-cognizable violation of article 1.14, which at the time of defendant's trial prohibited jury waiver in capital felony cases).

Even if we assume that Applicant has shown a violation of article 35.11, he is not entitled to habeas corpus relief.

Yet that does not mean article 35.11 is unoffended. While it did not violate the letter of the law, her process violated the spirit of the law. "The jury shuffle is designed to ensure the compilation of a random list of jurors." *Ford v. State*, 73 S.W.3d 923, 926 (Tex. Crim. App. 2002). "[T]he purpose of the statute is . . . to ensure that the members of the venire are listed in random order." *Id.* Barchak's process was systematic and designed to control the distribution of white-and-non-white and Pearland-and-non-Pearland jurors. That is not random.

### IX — Conclusion

In conclusion, upon the issue we filed and set this case, we hold that the *McGinnis* test applies to a claim that a Texas county's method of assembling jury panels violates due process because it involves racial discrimination. In order to obtain relief, a litigant needs to show: (1)

systematic exclusion of a particular group; and (2) that exclusion rendered the jury plainly illegal in its composition.

On the merits, we agree with the habeas court that former Brazoria County District Clerk Rhonda Barchak utilized a race-based system to create jury panels. However, we disagree with the habeas court's conclusion that her system did not impact the racial composition of panels in Brazoria County. Barchak's system was designed to have a racial impact: it was calculated to yield jury panels having, as nearly as possible, the same proportional makeup of whites and non-whites, Pearland residents and non-Pearland residents, as the general venire. Nevertheless, we agree with the habeas court that there is no showing under *McGinnis* that Barchak's system caused the exclusion or underrepresentation of non-whites. Instead, her system was meant to have the opposite effect: inclusion and representation. Applicant has not shown a violation of the Due Process Clause of the Fourteenth Amendment.

He has also not shown a violation of the Equal Protection Clause of the Fourteenth Amendment. There is no showing under *Partida-Ovalle* that Barchak's system caused non-whites to be disproportionately left out of jury service over a significant period of time.

Additionally, Barchak's process did not violate the Impartial Jury Clause of the Sixth Amendment because, regardless of whether Applicant's particular jury panels were fair and representative in relation to the community, there is no showing under *Duren* that her procedure systematically excluded non-whites and was the cause of any underrepresentation.

We agree with the habeas court that any error caused by Barchak's process is not structural. Accordingly, Applicant is not entitled to habeas corpus relief. We adopt the habeas court's recommendation, and we deny the application.

Delivered: July 31, 2024
Publish